UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                                       :

UNITED STATES OF AMERICA          :

                                       :

       - v -                      :                21 Cr. 454 (CM)

                                       :

DAVID LETHEM,                  :

                                       :

                    Defendant.    :

                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## GOVERNMENT'S SENTENCING MEMORANDUM


 

 

                                      JAY CLAYTON
                                        United States Attorney for the
                                          Southern District of New York

PETER DAVIS
JAMES MCMAHON
Assistant United States Attorneys

- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                              :
UNITED STATES OF AMERICA          :
                                              :
        - v -                                   :                    21 Cr. 454 (CM)
                                              :
DAVID LETHEM,                         :
                                              :
                Defendant.             :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The Government respectfully submits this sentencing memorandum in connection with the sentencing of David Lethem, now scheduled for May 13, 2025 at 11:00 AM. The defendant has provided substantial assistance to the Government in the investigation and prosecution of others. Accordingly, assuming he continues to comply with the terms of his cooperation agreement, the Government intends to move at sentencing, pursuant to U.S.S.G. Section 5K1.1, for the Court to sentence him in light of the factors set forth in Section 5K1.1.

**I. Background**

**A. *The Company and its Leadership***

FTE Networks was a telecommunications company based in Naples, Florida. The company had revenue of approximately $12 million and an operating loss of $1.6 million for the 2016 calendar year. In April 2017, FTE completed a leveraged acquisition of Benchmark Builders, Inc. for approximately $75 million. Benchmark had historical revenue between $300 million to $400 million.

Prior to December 2017, FTE's common shares traded on the OTCQX market. After FTE acquired Benchmark, the company's stock traded on the NYSE American exchange. The company's common stock was suspended from trading on the NYSE in December 2019 because

FTE had violated NYSE rules by issuing additional shares to support convertible debt without shareholder approval and by failing to submit listing applications for those shares. The company's stock was subsequently delisted from the NYSE.

Michael Palleschi was the chairman of FTE's Board of Directors and its Chief Executive Officer from January 2014 to May 2019. In May 2019, Palleschi resigned from FTE after being informed that FTE was not renewing his employment agreement. Before joining FTE, Palleschi was Chief Operating Officer at a venture capital fund focused on telecommunication companies and held various senior management roles at several major telecommunication companies. Palleschi holds a degree in Engineering and Business Management.

David Lethem was FTE's Chief Financial Officer from June 2014 to March 2019, when he resigned. Before joining FTE, Lethem was the Director of Finance and Audit for an auditing firm. Lethem holds a Master of Business Administration from California Coast University.

Anthony Sirotka served as FTE's interim Chief Executive Officer from January 2019 to October 2019. Prior to that, he served as the company's Chief Administrative Officer, senior vice president of business development and chief business development officer. Before joining FTE, Sirotka was principal of a telecommunications firm, and also served as the senior Northeast program manager with Level 3 Communications. He is a graduate of the New York Institute of Technology.

Daniel Moser, whose case is pending before Judge Abrams, was FTE's controller from April 2017 to May 2019. Moser did not graduate from college and is not a certified public accountant. Before he worked at FTE, Moser worked as a restaurant manager and as a controller and cash accountant for various truck and car dealerships. Moser was Lethem's neighbor. When FTE bought Benchmark Builders in the spring of 2017, Lethem offered Moser the FTE controller's

position for $100,000 a year.  Moser described his duties at FTE as handling the trial balance and the balance sheet and reconciling assets and bank statements.

### B.  The Fraud

From 2016 to early 2019, Palleschi, Lethem, Sirotka, Moser, and others engaged in a multi-part fraud involving FTE:

*First*, Palleschi and Lethem actively concealed the conversion features of 71 convertible notes FTE had issued from 2017 to early 2019 with a total principal amount of more than $22 million.  While FTE recognized and disclosed the liability for the principal amounts due on the notes and the interest expense, the conspirators concealed the convertible nature of the notes.  As a result, they knowingly caused FTE to fail to account for the derivative liabilities and expenses arising from the issuance of the convertible debt and related stock warrants.  These unreported liabilities and expenses totaled approximately $56 million for derivative liabilities, $20 million for warrant liabilities and $36 million in expenses in 2017 and 2018.  These omissions were material.  They contributed substantially to FTE's restated net loss of $92 million for the period ending December 31, 2017, as opposed to the net loss of $20 million it had originally reported for that period.

*Second*, Palleschi, Lethem and Sirotka caused FTE to fraudulently recognize more than $12 million in revenue in 2016 through 2018 for work it never performed.  This fraudulent revenue included more than $10 million in "unbilled" revenue, which was revenue FTE falsely told its auditors it had earned from projects it had completed for AT&T but had not billed; another approximately $2.5 million in a fabricated "miscellaneous" receivable; and approximately $600,000 in revenue FTE falsely claimed it had earned from, and billed to, another customer named Metro Network services ("MNS").

*Third*, Palleschi embezzled company funds by taking company-paid private jet charter

4

flights on family vacations. Palleschi and Lethem also caused the company to give Lethem $100,000 with which to buy company stock in an effort to boost the share price. Lethem returned the stock after he resigned.

*Fourth,* Lethem, Palleschi, and others engaged in additional instances of criminal conduct at FTE, including:

- Lethem paid FTE's employees through direct wire transfers of the net amounts of pay to each employee for three payroll periods in the summer of 2017 but failed to pay over income tax and other withholdings to the IRS and state tax authorities.

- Lethem falsely told FTE's auditors in connection with the audit of the 2017 financials that the company had a credit balance of approximately $460,000 at the company's jet charter firm when the company actually owed the firm $130,000. Lethem altered an April 2018 account statement from the charter firm to show the credit balance and sent the altered statement to the auditors.

- Palleschi and Lethem caused Benchmark to transfer funds to FTE that New York law required Benchmark to hold in reserve to pay subcontractors. The Manhattan District Attorney has charged Palleschi and Lethem with grand larceny for that conduct. They await sentencing on those charges.

### 1. Convertible Debt Fraud

FTE issued convertible notes to several different lenders as early as 2016 and at an increasing rate through 2018 to January 2019. The notes generally provided that the lender could convert the note into a specified number of shares of unregistered FTE common stock at a substantial discount to the market price either upon default or, in some instances, at the election of the lender. Many of the notes also included warrants to buy the company's common stock. FTE issued approximately 5.4 million shares, or about 25% of its outstanding common stock, to convertible debt lenders. Those lenders who received stock were able to sell it following a six-month holding period, usually at a significant profit, which led to increasing downward pressure on the share price. During the period of the fraud, the share price peaked at $26 in late March 2018 but dropped to $1.77 by the end of October 2018, five months before the fraud was

publicly disclosed, and never recovered.  During that same period of March to October 2018, the S&P 500 stayed relatively flat.

Although FTE failed to disclose the convertible nature of its debt, its existence was not a secret among its higher level executives.  Director-1 and Palleschi referred convertible lenders and brokers to Lethem.  After FTE issued its first convertible note in 2016, Director-1 provided Palleschi and Lethem with a short article on convertible debt and opined that the convertible features of the one note were immaterial to FTE's accounting and, therefore, did not need to be disclosed.  As the amount of FTE's convertible debt increased, Director-1 opined, improperly, that the materiality of each convertible note should be considered independent of others.  This group took steps to conceal FTE's convertible debt from potential lenders as early as June 2017.  At that time, Director-1 asked Lethem to put together a presentation for a potential lender and "include (in my opinion) the convertible debt as well. . . . [T]hey all know each other.  It is best if we know up front, with all our 'hair', if they can do the deal, instead of find out [sic] 2 months from now they can't because they found out about some converts.  Michael's [Palleschi's] call, just putting it out there."  Palleschi disagreed, saying it was a "[t]ouchy situation . . . If [L]ateral[1] finds out, that will be problematic."  Director-1 then instructed Lethem to "exclud[e] any convertible notes for now" based on Palleschi's unsubstantiated hope that FTE would gain additional funding from another lender that would permit it to pay off the convertible debt.  Director-1 and Lethem subsequently sent a presentation that failed to disclose the convertible debt to the potential lender.

---

[1] Lateral was FTE's senior lender.  Its loan agreement prohibited FTE from taking on additional debt without Lateral's permission.

a. *Forged Transfer Agent Letters*

Lethem forged the signature of its transfer agent on four transfer agent letters in the summer of 2017 as part of an effort to hide FTE's convertible debt. He does not remember doing so but also does not deny doing so.

Convertible lenders require their borrowers to execute transfer agent letters before the loans are closed. In these letters, which were signed by Lethem as CFO and purported to be countersigned by a representative of the transfer agent, FTE irrevocably directed the transfer agent to set aside a specified number of shares for issuance upon possible conversion of the note. The transfer agent's countersignature assures lenders that shares have been set aside for them and would be available for them in the event of conversion. Lethem gave lenders letters with forged signatures of the transfer agent in an effort to hide the convertible nature of FTE's debt from the transfer agent and, consequently, FTE's accountants who had access to the transfer agent's records.

The first forged letter was discovered in August 2017, when Essex Global Investment Corp., a convertible lender, asked ClearTrust, FTE's transfer agent in 2017, to confirm the authenticity of a transfer agent letter it had received from Lethem. The signature of the transfer agent employee on the letter was clearly and amateurishly forged. The signature line suddenly dropped in two places and the letters "CLEA" in the word "ClearTrust" above the signature line were not aligned with the rest of the letters. ClearTrust checked its records and confirmed that its employee had not signed the letter and that the letter was not in its files.

The attorney for Essex Global Investment in the transaction also represented other holders of convertible notes issued by FTE. When ClearTrust told him the Essex Global letter was a forgery, he asked ClearTrust to review the outstanding transfer agent letters from FTE for the rest of his clients. ClearTrust found a second forged letter, also signed by Lethem, that

corresponded to a note to GS Capital Partners dated June 27, 2017.  The ClearTrust representative whose signature was forged, Matthew Luginbuehl, never signed the letter because he never received a written resolution from FTE's Board of Directors authorizing the company to enter into the note.  Luginbuehl told Lethem multiple times that he would not sign the letter without a Board resolution and Lethem eventually told him that "GS can wait for now."  The email traffic shows that Lethem sent the forged letter to GS Capital's attorney.

ClearTrust discovered a third forged letter supposedly signed on behalf of a lender for which ClearTrust had no record and, a few months later, found a fourth forged letter when Emunah Funding, an FTE convertible lender, presented ClearTrust with a forged letter.

ClearTrust told Palleschi about the forged letters and asked that FTE conduct a complete audit of all its transfer agent letters.  There is no evidence that such a review was done.

### b. FTE's Accountants Begin to Discover the Convertible Debt

In December 2017, FTE hired a certified public accountant ("Accountant-1") as its Director of External Reporting.  Accountant-1 discovered soon after she arrived that FTE was taking on additional debt because she had access to the general ledger.  She did not know, however, that the debt was convertible.  Lethem falsely told Accountant-1 FTE's non-Lateral debt consisted of straight promissory notes and further falsely told Accountant-1 that share issuances to lenders were only to settle debt that FTE did not have the cash to pay down.  Lethem instructed Moser not to show Accountant-1 any notes.  When FTE's outside auditors asked Accountant-1 for copies of the notes as soon as she started working at FTE, Lethem and Moser told Accountant-1 they did not have the notes.

In late February 2018, FTE hired Accountant-2, another certified public accountant, as its Assistant Controller.  Accountant-2 took primary responsibility for accounting for FTE's debt. He could see deposits from, and payments to, FTE's lenders in the company's bank accounts.

He recognized many of FTE's lenders as being convertible lenders. When Accountant-2 asked for copies of the notes, Moser initially told him that FTE did not have written loan agreements. Lethem and Moser told Accountant-2 to record new debt as promissory notes.

In March 2018, Moser mistakenly sent a file to Accountant-2 that contained convertible notes. With his suspicions now confirmed, Accountant-2 explained the details of derivative accounting to Moser and recommended that FTE restate its financial statements to account properly for its existing convertible debt. Accountant-2 also told Moser and Accountant-1 that FTE had also failed to account properly for warrants the company issued as part of debt in 2017. Moser respected Accountant-2's accounting knowledge and accepted his conclusion that FTE needed to restate. He arranged to have Accountant-2 explain the need for a restatement to Lethem. Lethem refused to restate because he did not want FTE to incur what he claimed was the $100,000 expense of a restatement. Lethem also told Moser that the convertible notes were immaterial. Accountant-2 told Moser he disagreed with that conclusion but was not willing to confront Lethem on the issue.

Accountant-2's and Accountant-1's discomfort about the convertible debt is apparent in the email traffic. In mid-March 2018, as Moser and Accountant-2 were campaigning for a restatement, Moser said in part in an email to Lethem "I sense both [Accountant-1] and [Accountant-2] are uneasy with the convertible notes. Not sure just how serious it is." Lethem responded "Don't care...[Accountant-1 and Accountant-2] are here to do a job...they can do it or leave."

Moser continued to press for a restatement. Lethem ultimately told Moser that he, Director-1 and Palleschi had met with Auditor 1, FTE's outside audit partner at Marcum LLP, to discuss how to handle the convertible notes. Lethem told Moser that Auditor-1 had opined that

the conversion features would be immaterial as long as FTE paid down the notes before they came due. Based on that, according to Lethem, Palleschi had decided not to restate. Auditor-1 has denied providing such an opinion.

Lethem engaged in persistent efforts to mislead Marcum about FTE's convertible debt. On or about the same day he told Moser that Palleschi had decided not to restate, Lethem directed Moser to tell Marcum falsely that FTE could not obtain copies of several convertible notes, including five notes which had converted. Moser did so by email on April 11, 2018. Marcum never challenged this misstatement.

Further, over the weekend of April 7, 2018, Lethem sent Auditor-1 at least nine emails showing that he had paid off notes that were convertible. None of the emails contained any hint that any of the notes were convertible and Lethem even doctored three confirming emails to strip out all hints that those notes were convertible.

Finally, Lethem made another false statement to Marcum on April 14, 2018 when he denied that FTE entered into two specific convertible notes in 2017. A Marcum auditor asked about the notes after reading in the minutes of FTE's Board meetings that the company had entered into the notes. Lethem copied Palleschi, Moser and Accountant-1 on his email containing his false denial of those notes. Palleschi knew at the time Lethem's denial was false. A few months earlier, in early November 2017, Director-1 circulated to Palleschi and others a chart of FTE's convertible debt she and Company Counsel-1 had prepared. The first two notes on the chart were the notes Lethem denied FTE had issued. Palleschi had reviewed a draft of the chart and had made a comment on it a week before.

FTE, through Lethem, began to issue convertible debt at an increasing pace throughout 2018 and the email traffic shows that Palleschi was aware of it. On February 27, 2018, Palleschi

described in an email how he had spoken with a convertible lender, who had said he intended to convert. On March 23, 2018, Palleschi asked Moser for a list of the convertible notes and the dates they became convertible. He directed Moser to respond orally on the telephone rather than by email. In the summer and fall of 2018, Palleschi and Lethem were actively dealing with defaults on convertible notes by attempting to renegotiate notes. On August 24, 2018, Company Counsel-1 sent Palleschi, Lethem and Company Counsel-2 an email about defaults and identified nine different convertible notes, all issued in April and June of 2018. As FTE's stock experienced heavier selling volume, which was a natural result of conversions, Palleschi began to respond with threats to sue some of the convertible lenders for fraud and market manipulation.

### c. The Fake Notes

The arrival of Accountant-1 and Accountant-2 at FTE and their ensuing questions about FTE's convertible debt led Lethem to take additional steps to conceal new convertible debt he issued on FTE's behalf. Starting in April 2018, he created fake notes to give to Accountant-2 that matched the lenders, dates, and amounts of the real convertible notes but omitted the convertible features. The fake notes explained the deposits to, and subsequent withdrawals from, FTE's bank accounts and allowed Accountant-2 to recognize the principal liabilities and interest expenses while concealing both the notes' conversion features and associated warrants. Lethem retained custody of the real notes.

The fake promissory notes Accountant-2 received were fabricated by Lethem and, later, by an administrative employee at Lethem's direction. Lethem gave the administrative employee the names of the lenders, the note amounts and other necessary information and directed her to type fake notes from a template he had given her. The administrative employee prepared numerous fraudulent notes in this fashion and then, at Lethem's direction, sent them to Accountant-2 after Lethem signed them. In all, Lethem created, or caused to be created, at least

36 fake notes with a total principal amount of $14,033,903 from April 11, 2018 to January 3, 2019.

### d. The Forged Director Signatures

FTE's bylaws required that the Board of Directors approve each equity issuance, including convertible notes, and it is unlikely that any lender would have entered into a convertible note without that approval. Each of the convertible notes FTE issued in 2018 and early 2019 was accompanied by a written resolution of the Board authorizing FTE to enter into that particular note. Some of the directors have said that their signatures on many, if not all, of these resolutions were forged.

Lethem forged the directors' signatures on fake Board resolutions. Each forged resolution contained the signatures of the members of the Board of Directors below text stating "DocuSigned by" and above a string of numbers and letters that is supposed to be a unique identifier that authenticates each signature.[2] Lethem caused the same administrative employee who created the fake notes to create the fake resolutions by giving her a page containing the Board members' signatures in hard copy and directing her to type the date of a particular convertible note at the top of the page, print the page, photocopy the signatures onto the page, and then attach the resulting copy with the date, signatures and DocuSign text and identifiers to the written Board resolution.

### e. The GS Capital Note Incident

Lethem attempted to mislead FTE's auditors with respect to one of the largest convertible

---

[2] DocuSign is an online service that permits signatories to documents to provide secure electronic signatures by email. The signatories receive electronic versions of the documents they are asked to sign by email. DocuSign assigns a string of letters and numbers to each signature so that an electronic signature's authenticity can be confirmed.

notes issued by FTE.

On April 11, 2018, Lethem signed a convertible note to GS Capital in the amount of $1.4 million due on October 11, 2018. The conversion was subject to a floor price of $6.00 per share. On August 10, 2018, Auditor-2, a Marcum auditor, asked Accountant-1 and Accountant-2 in an email for a copy of the note, which email the accountants forwarded to Lethem. Lethem replied that he would send Marcum the note but did not do so.

While preparing the Form 10-Q for the third quarter of 2018 in early November 2018, Auditor-3, a new Marcum partner on the FTE audit, asked for a copy of the GS Capital note. On the same day, Lethem arranged for the administrative employee to prepare a fake version of the GS Capital note that contained none of the conversion features of the actual note.

Lethem never provided the fake GS Capital note to Marcum because he discovered that Auditor-3 had learned the GS Capital note was convertible from a confidential source. On or about November 8 and 9, 2018, Director-1 repeatedly pressed Auditor-3 to name the source but he would not do so.

Auditor-3 followed up to Lethem and others two days later, on November 11, with a list of Marcum's "open items," including the "GS Capital Partners loan agreement(s)" for "$1.4 million issued on April 11, 2018." Lethem forwarded this email to Director-1 and suggested that FTE tell Marcum that FTE was "looking for a new audit firm." Director-1 responded the next day to Lethem and Palleschi with a suggestion of a new audit firm for FTE.

On November 12, Lethem told Auditor-3 that the note had been stored on his laptop and was irretrievably lost due to the file being corrupted. When Auditor-3 asked if Lethem could obtain the note by other means, Lethem claimed he was unable to do so. Auditor-3 continued to press the next day by asking Lethem for any emails with the lender relating to the note. Auditor-

3 also opined that Lethem's failure to recover the note "would indicate a control failure in IT/no central repository and no backup ability. That needs to be added to" the Internal Control Deficiency Analysis in the 10-Q for the third quarter of 2018. Lethem forwarded this email to Director-1, who responded "Ugh! We need to change auditor I am getting references . . .."

The next morning, Auditor-3 told Director-1 "[t]he issue you and I spoke with over the phone is still Open. David Lethem has been unable to provide the note since we requested it at least two weeks ago. This is a barrier to moving forward." Director-1 replied with "David has not been able to locate the note. My understanding is that this will be provided prior to the audit and you had accepted this and were going to limit your scope in the 10Q." Within one minute, Auditor-3 replied "100% incorrect. That is absolutely not true." Director-1 replied, in pertinent part, "Since you won't share with me the name of your 'source' on the issues surrounding the note I can't make an assessment as to its credibility. I will call you during a break. David is also calling you shortly. We need to get the 10Q filed. . . ." Director-1 then called the partner in charge of Marcum's New York office in an unsuccessful effort to have Auditor-3's request for the note rescinded.

Lethem had the note all along. Despite his claim that he could not find the note or any related emails from GS Capital, he forwarded an email from GS Capital that contained both the convertible note and the corresponding securities purchase agreement to a consultant retained by FTE that night.

The next morning, Palleschi realized FTE had no option but to give Auditor-3 the note so that FTE could file its Form 10-Q with the SEC. In an effort to explain away his previous denials of having the note in his possession, Lethem, at what he has said was the direction of Director-1, created the appearance that Company Counsel-1 had suddenly and fortuitously found

a copy of the note. He forwarded an unsigned copy of the GS Capital note to Company Counsel-1 who emailed it back to him twenty minutes later. Pursuant to directions Lethem had given her in a telephone call, Company Counsel-1 included the notation "Dave, see attached. I got in late last night. Sorry for not getting back to you." Two minutes later, Lethem forwarded a signed copy of the note to Company Counsel-1 with the notation "Actually this is the document I was referring to..my bad." Company Counsel-1 returned the signed note to Lethem by email about thirty minutes later with the exact same notation. Lethem then forwarded the signed note to Director-1 and asked "Should you forward. To [Auditor-3]?" Director-1 emailed Auditor-3 the note, saying "[Company Counsel-1] found the note! Please see her email below and attached. We are assessing now . . . Please call David once reviewed. It appears to have a convertibility feature but does not have a floor which makes it less toxic."[3]

In response, Auditor-3 told Lethem and Director-1 that "[t]his most likely can be passed on the current disclosure." Ten minutes later, however, he emailed "So technically - as of today the GS Capital note is in default. I would have to disclose that in both the liquidity footnote and the Note payable footnote." Shortly thereafter, Director-1 forwarded Auditor-3's email to Palleschi with the notation "So far so good he has not mentioned derivative liability." Palleschi responded with an email containing the subject line "From [an FTE director]" and saying "On derivatives if it is mark to market you can do the calculations [of resulting liabilities and expenses] yourself. Don't need outside." These emails confirm that Director-1 and Palleschi had understood all along that convertible debt carried derivative liabilities and expenses with it for which FTE had not properly accounted. They also corroborate Lethem's statement that Director-1 openly admitted to him after FTE gave Auditor-3 the GS Capital note that she knew

---

[3] The note <u>did</u> have a floor of $6 per share, which made it <u>less</u> toxic.

FTE had not properly accounted for the debt.

### f. The Conspirators Falsely Deny the Existence of Other Convertible Notes

On the day after Company Counsel-1 "found" the GS Capital note, Auditor-3 emailed

Lethem:

> "[w]e would like [Company Counsel-1] to review the other so-called "promissory notes" in her files - send me an email and state that she is not aware of other agreements with contingent conversion features or toxic features. We want the email from her for our files because she has them and the GS note had conversion features.

Lethem forwarded Auditor-3's email to Director-1, who responded with three texts in quick

succession:

> I would have [Company Counsel-2] write the letter.
> Tell them [Company Counsel-1] didn't review the others [Company Counsel-1] did.
> I don't she will send what you need, just my gut.

Lethem then forwarded the email to Company Counsel-2 and Company Counsel-1. A few

minutes later, he sent Director-1 the following texts in quick succession:

> She's thinking about it.
> She doesn't like [Auditor-3].

Company Counsel-1 was fully aware of FTE's convertible debt, having prepared and

distributed to Palleschi, Lethem and Director-1 a series of spreadsheets detailing each of FTE's

convertible notes from June 2017 to January 2018. Despite that knowledge, Company Counsel-1

emailed Lethem and Auditor-3 the following day, stating in pertinent part: "Dave, this follows up

our call. As discussed, I do not know of, nor do I have in my possession, any material

outstanding notes you described." Company Counsel-1 has said that Lethem told her that

Marcum was only interested in individual notes of substantial size and that FTE had no notes

other than the GS Capital note that met that criterion.

Company Counsel-1's denial of other convertible debt at FTE was material. Per FTE's

restatement, for the third quarter of 2018—the filing Marcum was focused on in November 2018—FTE's Form 10-Q originally listed no debt derivative liability. As restated, however, FTEs true debt derivative liability that quarter was $2,627,000.

### g. The Note Scheme Collapses

By the fall of 2018, FTE's share price was dropping amid heavy trading volume, leading some shareholders, analysts and FTE employees to suspect that FTE had, in fact, issued convertible debt. The conspirators reacted with continued false denials and efforts to conceal the debt. For example, in September 2018, FTE's compliance officer received a conversion notice through FTE's Investor Relations email address and forwarded it to Palleschi with the note "Did not know there were possible converts." Palleschi then forwarded the email chain to Company Counsel-2 and directed him to "[h]ave them stop sending it to [IR] email address." On November 16, 2018, the compliance officer advised Palleschi by email that a stock promoter retained by FTE had told her "he is aware we have convertible notes . . . . I told him you and Dave [Lethem] have confirmed that we do not have converts and nothing is converting in the market, as this is my understanding." Palleschi responded the next day by telling the compliance officer he had spoken with the stock promoter. The stock promoter recalled speaking with Palleschi and said that nobody at FTE ever admitted to him that the company had convertible debt, despite his questions about it. At that same time, Company Counsel-2 told outside counsel that "Dan said that he asked Mike about GS or convertible notes he heard of and Mike denied we have any such loan."[4]

A combination of three contemporaneous events led to the collapse of the note scheme. *First*, in or about December 2018, Moser told Fred Sacramone, a board member and one of

---

[4] "Mike" apparently refers to Palleschi. "Dan" is probably Moser.

FTE's largest noteholders,[5] that Lethem had issued convertible notes, among other things. Sacramone demanded that the Board investigate Moser's allegations. *Second*, as described above, the stock promoter had begun to inquire aggressively of Palleschi, Lethem and the compliance officer whether the company had convertible debt due to significant selling of FTE's shares he had seen in the market. *Third*, on January 3, 2019, Lethem's administrative assistant mistakenly sent a new convertible note, instead of the corresponding fake note she had prepared at Lethem's direction, to Accountant-2 by mistake. When Accountant-2 questioned the administrative assistant about the note, she responded, in Moser's presence, that she would have to send him the "accounting copy" of the note. The administrative assistant then sent Accountant-2 a fake note, without conversion features, that corresponded to the convertible note she had sent him.

Accountant-2 brought his discovery to Moser, who confronted Lethem with it. Lethem denied doctoring any notes and said that the fake note Accountant-2 had seen was just a rough draft template. The incident, however, led to a meeting at FTE on January 22, 2019 attended by Accountant-2, Moser, Lethem, Director-1, Accountant-1 and others. Accountant-2 opined that the unreported convertible notes represented an accounting problem for FTE due to FTE's failure to recognize expenses arising from the issuance of convertible debt. Lethem claimed that he had amendments to the convertible notes the group had seen that removed the conversion and warrant features of those notes. Lethem never produced any such amendments. Instead, at Director-1's direction, Lethem began to email Accountant-2 and others copies of the real, convertible notes in early February 2019. According to Accountant-1, Lethem thereafter claimed

---

[5] Sacramone was a partner in Benchmark. He was given a seat on FTE's Board of Directors when FTE closed on the Benchmark purchase. Sacramone was issued notes by FTE as part of FTE's purchase of Benchmark.

the convertible nature of the notes was immaterial and that FTE's outside counsel had told him so.

### h. Accounting for Convertible Notes

Accounting for convertible notes and warrants is an extremely complex procedure. FTE recognized the cash received as an asset and the principal amount of the note and the original issue discount (the amount of principal withheld as a fee by the lender) as liabilities. It did not, however, disclose or account for the conversion feature of the notes. The note holder's ability to purchase the issuer's shares at a discounted price at a future date has a value separate and apart from the holder's right to recover its principal and receive interest. That separate value represents a cost and a liability to the issuer at the time the note is issued that must be recognized.

The proper accounting treatment for a conversion feature can varies depending on the terms of the underlying note. For its restatement, FTE analyzed each of the 71 convertible notes to determine which of nine possible accounting treatments applied to each note. The result was that FTE had to recognize, for many, if not all, of the notes, additional expenses to account for its loss in the issuance of the notes as well as additional liabilities arising from its obligation to sell the holder shares at a discounted strike price, usually either at maturity or upon default.

While FTE's outstanding debt was reported in its 2017 10-K and its 10-Qs for the first three quarters of 2018, the company did not identify any debt as convertible or any warrants arising from the convertible notes. The restatement showed FTE failed to identify $2.3 million in outstanding convertible debt as of December 31, 2017. It failed to identify $25.8 million in debt as convertible in its March 31, 2018 10-Q; $4.5 million of convertible debt in its June 30, 2018 10-Q; and $8.1 million of convertible debt in its September 30, 2018 Form 10-Q.

The company's restatement also shows that these omissions were quantitatively material.

19

The restated financial statements for the year ended December 31, 2017 include additional debt derivative liabilities of $48 million and additional warrant derivative liabilities of $16 million, thus almost doubling current liabilities for the period. These additional liabilities were the primary drivers of a restatement of shareholders' equity from a positive $8 million to a deficit of $78 million. The restated income statement for the period recognizes a $35 million loss on conversion derivative liability; a $24 million loss on issuance of notes; and a small loss on warrant derivative liability. These losses were the primary drivers of an additional $72 million in expenses, leading to a restated loss of more than $92 million for the year.

The restated financial statements for the three month period ending March 31, 2018 include additional debt derivative liability of $22 million and additional warrant liability of $29 million, thus almost doubling total current liabilities and substantially contributing to a reduction in shareholder equity from a positive $12 million to a deficit of $56 million. The restated income statement for the period recognizes an $11 million gain on debt derivative liability and a $13 million loss on warrant liability. Due to other adjustments, the company ended up doing better during this period following the restatement, with a loss of .19 a share as opposed to a pre-restatement loss of $2.09 a share.

The restated financial statements for the three-month period ending June 30, 2018 include additional debt derivative liability of $8 million and additional warrant liability of $26 million, thus adding $34 million to current liabilities to bring that figure to a total $172 million in the restatement. This adjustment substantially contributed to a reduction in shareholder equity from a positive $2 million to a deficit of $45 million. The restated income statement for the period recognizes a $6 million gain on debt derivative liability and a $2.7 million gain on warrant liability. Ironically, the company ended up doing better during this period following the

restatement, with a gain of $1.13 a share as opposed to a pre-restatement loss of $2.26 a share.

The restated financial statements for the three-month period ending September 2018 include additional debt derivative liability of $11 million and additional warrant liability of $11 million, thus adding $22 million to current liabilities to bring that figure to a total $163 million in the restatement. This adjustment substantially contributed to an increase in shareholder deficit from $5 million to $41 million. The restated income statement for the period recognizes a $2.6 million loss on debt derivative liability and a $14 million gain on warrant liability. Ironically, the company ended up doing better during this period following the restatement, with a loss of $1.68 a share as opposed to a pre-restatement loss of $1.89 a share.

The omissions and the misstatements derived from those omissions were also clearly qualitatively material. A reasonable investor would want to know that FTE was relying on convertible debt in making an investment decision with respect to FTE. Reliance on toxic convertible debt is a sign of dire financial problems. Issuance of convertible debt dilutes the value of existing shareholders' shares. Sales of the shares issued upon conversion drives down the share price, thus earning convertible debt the nickname "death spiral financing." A reasonable investor would sell, or decline to buy, the shares of a company that relied so heavily on convertible debt.

### 2. Revenue Recognition

Between 2016 and 2018, Palleschi, Lethem, Sirotka, Moser and others included fraudulent revenue in FTE's financial statements. Although Palleschi at the time compared the materiality of the fake revenue to "a chair off the Titanic," the fake revenue was clearly material. For the year ended December 31, 2016, FTE's financial statements overstated the company's revenue by approximately 108% and accounts receivable by approximately 477%. For the each of the quarterly periods in 2017 and 2018, FTE's financial statements overstated the company's

accounts receivable by between 18% and 120%.

The scheme centered on three sets of fictitious revenue:  1)  approximately $10 million in fabricated revenue as of 2018 supposedly earned from services performed for AT&T in 2016 and 2017 for which FTE never billed AT&T; 2) approximately $2.5 million in fake revenue purportedly earned from services performed for AT&T and others in 2017; and 3) about $600,000 in fake revenue purportedly earned from services performed for Metro Network Services ("MNS") in 2015, which was invoiced but not paid.

### a.    *Unbilled Revenue from AT&T*

In or about February 2016, Jus-Com, Inc., the FTE subsidiary that installed cable networks, entered into an agreement with AT&T which provided for Jus-Com to perform work for AT&T in two stages.  First, Jus-Com would conduct site surveys of apartment complexes to estimate the cost of installing cable.  Jus-Com was paid $1,200 for each of these surveys. Second, after Jus-Com provided AT&T with the results of the site surveys, AT&T would issue a purchase order if it wished to proceed with the actual work.

Almost all the purchase orders issues by AT&T to Jus-Com were for the $1,200 site surveys instead of actual work at project locations.  AT&T paid Jus-Com approximately $2.5 million from 2016 through 2018.

### (1)   *The 2016 Form 10-K*

In preparation for FTE's 2016 year-end audit, FTE provided Marcum with a spreadsheet listing a total of approximately $8,814,977 in unbilled revenue from several customers, including AT&T, for work FTE had not done.  Throughout April 2017, Marcum repeatedly requested documents to confirm that FTE had completed the work identified on the spreadsheet so that the revenue could be recognized.  FTE management first falsely told Marcum that there were no documents to show FTE had done the work and later provided fake documents to prove it had.

For example, on April 13, 2017, Moser told Auditor-2 that FTE could only calculate unbilled revenue through an arithmetic formula that considered FTE's expenses and its historical gross margin of 38%. Moser acknowledged that "this makes it very hard to audit." At Lethem's direction, Moser also sent an email to Marcum stating that FTE's internal systems did not allow the Company to provide more concrete support for the unbilled revenue, such as purchase orders by which particular jobs could be audited. No purchase orders existed to support much of the unbilled revenue because the work had not been performed.

Auditor-1 continued to question the large amount of unbilled revenue. Moser then emailed Lethem stating that there was "[n]o where to go" on the unbilled revenue and quit FTE, although he rejoined FTE a few months later. In a series of emails after he quit, Moser remonstrated with Lethem concerning FTE's reporting of fake revenues. For example, on April 19, 2017, he wrote:

> You and I both recognize there is a minimum of 2,000,000 of loss that is sitting in your [cost of good sold] and has been cover [sic] by unbilled revenue. [Auditor-1] at least suspects this but while not being willing to allow the exaggerated revenues is willing to let you hide it for now in a prepaid account. At this point it is anyone's guess whether you have to restate the 3rd qtr Q.

On April 27, 2017, Moser emailed Lethem explaining that, to avoid FTE's late filing of the Form 10-Q for the fourth quarter of 2016, "[a]ll we needed to do really was get around the unbilled. That and the 600,000 [in unpaid invoices supposedly issued to MNS]." The following day, April 28, 2017, Moser followed up in an email to Lethem that there was "no justification for even 5 mil of unbilled in the 4th qtr" and that it should not be Lethem's responsibility "to make them [the numbers] real." Moser continued that "I suspect through no fault of your or your people the Q will be late as it should be with no true revenues, or detail to support it!" Moser encouraged Lethem to "Make your numbers real!"

On May 4, 2017, Auditor-1 emailed Palleschi and Director-1 regarding the unbilled and stating that "David [Lethem] . . . tells me the company has no documentation to support that the work was done. I find that hard to believe . . ." and again requesting support for the unbilled revenue. At this point, Palleschi and Lethem prepared and sent Auditor-1 a fraudulent spreadsheet containing a list of projects FTE had supposedly performed for AT&T and fake revenue amounts for those projects.

Auditor-1 and Auditor-2 asked Lethem, Palleschi and Director-1 the next day for backup documents to support the revenue for randomly chosen projects contained on the spreadsheet. Six days later, an FTE vice president emailed Auditor-1 and then Palleschi eight screenshots of an internal FTE database containing price quotes pertaining to eight of the projects Marcum had selected for testing from the fraudulent spreadsheet Palleschi and Lethem had given to Marcum. At Palleschi's request, the Vice President also forwarded to Lethem a set of approximately 29 invoices from FTE to AT&T relating to the projects listed on the spreadsheet. These invoices were fraudulent in that the purported services described in them had never been performed.

FTE's 2016 Form 10-K, filed on May 11, 2017, included approximately $5.8 million in fictitious revenue listed on the fraudulent spreadsheet discussed above. FTE's total revenue as listed on the Form 10-K was $12,269,079.

### (2) The 2017 Forms 10-Q

On May 23, 2017, Moser emailed Auditor-1, copying Lethem and Palleschi, a spreadsheet listing a total unbilled revenue as to AT&T of approximately $4.4 million, decreased from the starting $5,825,558 figure supposedly because some of the unbilled revenue had been billed in the first quarter of 2016. Lethem emailed Auditor-2 on May 22, 2017 stating that "there was no [work in progress] added for this quarter at all." On May 25, 2017, FTE filed its first

quarter 2017 Form 10-Q, listing accounts receivable of $9,984,873 as of March 31, 2017 but not indicating how much of this was unbilled revenue.

The general ledger included an additional $1.7 million in unbilled revenue in the second quarter of 2017. In preparing FTE's second quarter Form 10-Q, Marcum questioned the substantial amount of unbilled revenue remaining on FTE's books and why those services could not be billed. Moser suggested to Lethem that FTE reply "[a]s you are aware we have had some issues with AT&T being very difficult to get approval from to close jobs and get them invoiced" and that "[f]or whatever the reason AT&T's system doesn't accept our requests to close these projects . . . Perhaps we say we are finished and they say not." Right below this draft email, Moser wrote a note to Lethem stating, in pertinent part:

> This is the very best story I could come up with. At this point they are all still good receivables. Just my story, I realize you would know much better than I whether a story such as this would help or hurt. Was thinking if you could sell it with the promise that they will be gone for the next Q, [Auditor-1] might let it ride, tell Mike its going to happen so he better get with Lynn and find some new unbilled and a significant amount of revenue. . . .

On August 21, 2017, Moser, copying Lethem, emailed Marcum a spreadsheet that listed unbilled revenue for AT&T of approximately $4,120,140, bringing the total fraudulent unbilled revenue to approximately $10,077,000. The same day, FTE filed its second quarter 2017 Form 10-Q reflecting that number.

The following day, August 22, 2017, Moser sent Lethem an email stating that, while he had followed Lethem's direction to provide Marcum support for the unbilled receivables, he was "concerned about their legitimacy":

> wanted to bring to your attention what appeared to both [Marcum] and I to be obvious inconsistencies in the collection and reporting of the Unbilled by the field Ops. I wanted to make sure you were aware that I have no paper trail to document the data that was reported on the unbilled outside of the Charter Invoices. A large portion of the unbilled appear to have aged significantly. As such having no

indication of why these have not been paid I am obviously concerned about their legitimacy and our ability to convert them to collectible invoices.

Moser forwarded this email from his FTE email account both to his personal email account and to his wife with the note "If he gets confrontational I am going to quit and will most likely be a whistleblower. These guys are slippery which makes me very uncomfortable."

In September 2017, Moser told Lethem that "[f]or the record, I will have absolutely nothing to do with Unbilled for the 3rd Qtr., unless of course they are legit.  So please do not ask."  FTE's third quarter Form 10-Q, filed on November 16, 2017, listed substantial sums as accounts receivable, but did not identify any of this revenue as unbilled.

### (3)   The 2017 Form 10-K

As of December 31, 2017, unbilled accounts receivable totaled $10,077,201.

In early January, 2018, Moser emailed employees in FTE's Operations department with the subject "Gentlemen – I need those unbilled! ASAP Please!" The employees responded that there was little or no unbilled revenue.  Moser acknowledged this in a follow-up email to Lethem stating "Unbilled's – my break out shows we have none.  With absolutely no help from Ops nowhere to go."

A month later, Moser emailed Lethem "[u]nbilled need to just be what they are. . . . Maybe you are going to have to take the hit. You have to make the unbilled an operational problem. Mike Palleschi needs to be the heavy on this. He needs to be all over Anthony [Sirotka], and gets us something we can makes some kind of sense on.  . . .. "[Palleschi] needs to understand this was wrong and we as a company listed on the NYSC [sic] can not [sic] ever do this again."

In late March 2018, Lethem and Palleschi together told Moser[6] that they had found additional unbilled revenue and that they needed to come up with support for $4.2 million in unbilled revenue.  The $4.2 million figure was the approximate sum of 21 sample projects Marcum had selected for testing.

Shortly after Moser spoke with Palleschi and Lethem, FTE employee T.S. gave Moser a zip drive containing false documentation of unbilled AT&T revenue.  Moser used these documents to create a spreadsheet showing total unbilled revenue of $10,054,428, which was approximately $22,000 less than the previous unbilled revenue figure.  Rather than write off the old and false unbilled revenue and then recognize new and false revenue, Moser made  a $22,000 entry in the unbilled account to adjust the old unbilled figure of roughly $10,077,000 to the new unbilled figure of $10,054, 000.

Lethem sent an "unbilled worksheet" to Auditor-1 and Director-1 showing this new and false unbilled revenue as of December 31, 2017.  The spreadsheet contained a tab listing 95 "project codes," along with purchase order numbers, dates, and amounts for each project.  At Lethem's direction, Moser uploaded to Marcum the records from T.S.' thumb drive as supposed backup for the AT&T unbilled revenue.

On March 30, 2018, Auditor-1 emailed Lethem, Palleschi and Director-1 stating that he had just spoken by phone with Moser who told Auditor-1 that FTE did not have sufficient documentation to support unbilled revenue FTE was reporting.  Auditor-1 went on to say that "[t]hat is what we went through last year . . . "  Lethem responded that Sirotka and T.S. did have documents showing that "AT&T signed off that the work was done" and that FTE would forward

---

[6] Moser recalls that Sirotka participated in this conversation as well.  Lethem reported that Sirotka was not present and Sirotka does not recall the conversation.

the records.  Lethem also forwarded Auditor-1's March 30, 2018 email to Moser asking "Is this true? Why would u say that?"  Moser's reply reflects the need for FTE to tell "stories" to substantiate the unbilled revenue:

> 2. **Proof of completed work.** Told him that this would come from Ops.  If that means I don't have it, it is because I don't have it.  He's a smart guy and figured out that if it needs to come from Ops I most likely do not have it and I don't.  He indicated that he thought Tony had it on his computer.  I spoke with Anthony and told him that Alan was wanting proof of completion.  Asked Anthony if perhaps we could use the same document that was used for proof of completion on the sight survey's.(contains the Proj ID) Never ever said we do not have proof of completion.  He was going to call Mike and I believe he is working on that now.   I am thinking maybe he would accept the second file which shows the job uncompleted but I am not his mind reader.  I do not have proof of completion.  Only Anthony would have that at this point or why would we not have billed it.  You put me in the middle of a firestorm and want to treat me like I lit the fire.  Really.  Goes back to what I told you on the phone.  We can tell a couple of stories but they better all be the same one.  These problems were not created by me!

Less than a week later, Moser sent Lethem an email with the subject "My Future with FTE," in which he expressed disappointment that he did not receive a raise.  Moser stated "[u]nfortunately for me I know it all.  I have to deal with the bullshit and try and balance my own integrity each and every day."  Moser further said:

> You need someone who knows but does not tell.  That would be me.  While I am not willing to participate in the gray I am willing to overlook it so long as it does not have legal ramifications to me.  In other words there is a huge difference between lying and overlooking and keeping ones thoughts to himself.

On the same day, a Marcum auditor asked Lethem, Moser and Accountant-1 for supporting documentation for the 21 unbilled projects totaling approximately $4,295,069 Marcum had randomly chosen for further testing.  Moser, Accountant-1 and T.S. responded with purchase orders for the $1200 site surveys for the 21 projects.  The documents did not provide support for the larger sums FTE had claimed in the spreadsheet.  Auditor-1 replied that this "looks like this is just the support for the $1200 not for the other work invoiced."

On April 6, 2018, Moser emailed Lethem, Sirotka and Palleschi to say, falsely, that "[t]he issue with these jobs is that you do not get paid until the entire job is completed by all the

vendors."  This became the conspirators' false explanation for the unbilled status of the fake

revenue:  that AT&T would not pay any vendor for its work on a project until all vendors on that

project completed their work.  Lethem sent the false explanation to Auditor-1, copying Palleschi,

on April 15, 2018.

Marcum continued to ask for supporting records.  Sirotka sent Auditor-1, copying

Lethem, "screenshots from the operations database reflecting 10 of the MDU construction

projects."  The screenshots were from an internal FTE Operations database and listed quotes for

10 of the 21 projects identified by Marcum.  The amounts listed had never been earned by FTE.

Auditor-1 replied that they would reach out "to see what underlying support is for this screen

shot like how it ties to the unbilled amount and who enters the dates in the system . . . But this is

good."  Palleschi emailed Auditor-1 that Sirotka was "reaching out to the field managers

tonight/tomorrow and will get" documentation that FTE had performed the services included in

the unbilled revenue.

Lethem then forwarded to Auditor-1, copying Sirotka and Palleschi, five invoices—

purporting to be for projects listed on the spreadsheet— totaling $605,759.16 and purportedly

issued to AT&T for work that had previously been classified as unbilled.  The invoices described

work never performed by FTE for AT&T, listed amounts never authorized by AT&T, and were

never sent to AT&T.  Moser later referred to these as "[i]nvoices created to convince the auditors

that we had received confirmation on some of the 10,000,000 unbilled."  On or about May 1,

2018, after FTE filed its 2018 Form 10-K, Moser deleted these invoices from FTE's accounting

system.  Lethem later directed Moser to add the invoices back in.

On April 13, 2018, T.S. emailed Palleschi and Sirotka 21 fake "Job Completion Notices,"

for the 21 projects for which Marcum had requested additional support.  FTE did not have such a

form. Instead, the conspirators copied a similar form used by one of FTE's customers to create the false appearance that FTE had completed the work. Both Sirotka and Palleschi separately forwarded these to Lethem, who forwarded them to Auditor-1, copying Sirotka and Palleschi. The next day, Lethem falsely represented to Marcum in an email that FTE had completed the work as identified in the site surveys:

> **From:** David Lethem
> **Sent:** Saturday, April 14, 2018 12:26 PM
> **To:** 'Lucero, Vanessa' <Vanessa.Lucero@marcumllp.com>; Markowitz, Alan
> <Alan.Markowitz@marcumllp.com>
> **Cc:** Gibson, Kathryn <Kathryn.Gibson@marcumllp.com>; Anthony Sirotka <asirotka@ftenet.com>
> **Subject:** RE: Invoices for AT&T Deregulated
>
> Just talked to Anthony...the attached document, which is just one sample, contains all the
> information we put together from the site survey, which includes the scope of work tab we prepare
> for att. We tell them what materials, any issues which may be encountered with the building, our
> work, their responsibilities, etc. This is sent to att and then we start the work, etc.
>
> Anthony...please correct anything per our call just now if im not 100% accurate.

As noted above, Lethem asked Sirotka to "correct anything" inaccurate but he did not do so. As Sirotka has admitted, the email was inaccurate because FTE had not performed any of the described work and was not authorized to do any work without first receiving an AT&T purchase order.

The next day, Palleschi, with help from Lethem and Sirotka, drafted an "Unbilled Memo," which contained the false representation that "We are only authorized to bill the customer when all trades have completed all work." Sirotka, while knowing the memo as false, replied "Looks good." Palleschi replied "Good with me. Fire away." Lethem then uploaded the memo to Marcum's portal and confirmed in an email to Palleschi and Sirotka that he had done so.

FTE's 2017 Form 10-K, filed on April 18, 2018, listed at least $10,077,000 in fraudulent "unbilled" revenue from AT&T.

### (4)  FTE's 2018 Forms 10-Q

FTE's first quarter 2018 Form 10-Q included the same $10,077,000 AT&T unbilled receivable as listed in the 2017 Form 10-K.  Moser told Accountant-1 that "[i]n the short time between the K and Q we have had no activity" on the unbilled accounts receivable.

On June 19, 2018, Moser raised emailed Lethem and Sirotka about the problems inherent in carrying the same unbilled figure from quarter to quarter:

> We need to have the unbilled from **previous** Quarters resolved by June 30th.  From what I can see we have the following issues.
>
> 1. 2.5 Mil in Misc Receivables that we have told the auditors we are in discussion trying to collect.  We will at a minimum need to show concrete activity toward their collections.
> 2. 600,000 in a total of 5 invoices there were setup as payment toward the unbilled we submitted on the 10-K.  If we are going to be paid on these then we need to be or have an explanation as to why not.
> 3. 10 million in unbilled from December of which we (see item #2 above) we have billed 600,000.  The problem here is that we have shown no payment of any kind toward these.
>
> We have the potential to be forced into a 13,000,000 write-off if we don't get our ducks in row.  At this point the office has no ability to respond to any questions that the auditors will most likely have.

As Moser predicted, Marcum questioned in an August 9, 2018 email why the unbilled figure for the second quarter was unchanged from the first quarter.  Moser emailed Sirotka, copying Lethem and Palleschi, asking him "to put together some kind of unbilled . . . to get us to at least 600,000 revenue." Moser explained that this additional revenue was needed to replace the roughly $600,000 FTE had supposedly invoiced to AT&T back in April 2018 in an attempt to show some progress in collecting the unbilled.  Despite Moser's efforts, FTE included the same $10,077,000 unbilled AT&T receivable in its second quarter 2018 10-Q.

### b. The 2017 Miscellaneous Receivable

FTE's 2017 revenue figure included a "miscellaneous receivable" in the amount of $2,463,085.  This receivable was made up of amounts purportedly due to FTE from various customers, including more than $2 million from AT&T.  On February 5, 2018, Moser emailed

Lethem stating "[t]he auditors are already circling on the 2.5 mil wanting to know if these were booked against revenue." Moser was never provided any support for this revenue and therefore reversed it as of October 1, 2017. Lethem subsequently directed Moser to re-record the receivable, and Moser did so the same day.

On March 25, 2018, Auditor-1 emailed Palleschi, Lethem, and Director-1 to follow up on a prior email "regarding our request for support for a $2.5M that is currently sitting in other misc. receivable and revenue" which Moser "reversed . . . as there was no support for it, since March 2017, and David [Lethem], CFO, told him to place it back on the books." Auditor-1 stated that if support was not provided, this receivable would have to be reversed. Palleschi immediately forwarded this email to Sirotka.

Palleschi, aided by Lethem and Sirotka, created and sent Auditor-1 a fake email from an AT&T employee as support for the miscellaneous receivable two days before FTE filed its 10-K for 2017. Palleschi forwarded to Sirotka an email an FTE employee had received from R.M., a Senior Contract Manager with AT&T, two years earlier. The email contained a signature block for R.M., which included R.M.'s phone number and email address. Palleschi used R.M.'s email[7] to create a fake email stating:

> As we just spoke, thank you for reaching out regarding the outstanding and unbilled T&E projects completed by FTE in 2016/2017.
>
> I will be instructing field personnel to review and approve all outstanding work orders not issued to FTE in relation to the T&E work this week. Understanding this work is in excess of $1,500,000, we will expedite the process and work with you to expedite payments. This may take some time to process as some of these projects are closed out, however we will work diligently to process as soon as possible. Thank you for your patience and continued partnership.

The signature block of R.M. in the fake email omitted R.M.'s phone number and email address. This email created the appearance that AT&T intended to pay the miscellaneous receivable

---

[7] Palleschi does not recall drafting the fake email but both Lethem and Sirotka said he did.

shortly, which meant that FTE could continue to recognize it.

Lethem forwarded this fake email in PDF format to Auditor-1, copying Palleschi and Sirotka. Shortly thereafter, Auditor-1 asked "Any chance this can be forwarded to me which shows the email address is an AT&T email [?]" Within a minute of receiving this request, Lethem forwarded it to Sirotka with the note "??" Sirotka then sent Palleschi the fake email in a native email format that did not contain any AT&T email addresses as had been contained in fake PDF email. Two minutes later, Sirotka, while knowing the email was fake, sent this native version of the fake email to Marcum, copying Lethem and Palleschi, and stating "[h]ere is the original email."

Despite FTE's determined efforts to substantiate the 2017 unbilled receivable, Marcum nonetheless proposed that the receivable be written off in the 2017 audit. FTE declined to do so, stating in a representation letter dated April 17, 2018 and signed by Lethem and Palleschi that the "total amount of unapproved change orders as of December 31, 2017 are immaterial to the financial statements as a whole."

### c. The Fake MNS Revenue

FTE's accounts receivable from 2015 to 2017 included fake revenue from MNS, as represented in two fake invoices: one supposedly billed to MNS on October 31, 2015 in the amount of $217,000 and the second purportedly billed to MNS on November 31, 2015 in the amount of $365,875, for a total of nearly $600,000. FTE never performed the services described in the invoices.

As part of its audit of FTE's 2016 financial statements, Marcum requested written confirmations of balances owed from randomly selected creditors of FTE, including MNS. On April 10, 2017, Lethem told a Marcum accountant that he "finally got a hold of mns…they will be signing the a/r [accounts receivable] confirmation for the 217k and 365,875 receivables

today..i'll scan a copy to you."  The accountant responded that the confirmation would need to go directly from Marcum to MNS and be returned directly to Marcum from MNS, and asked Lethem to provide the "email address of your contact there" to send another copy of the confirmation form to MNS.   Lethem identified Pat O'Hare, a member of FTE's board of directors who was also a vice president of MNS, as the contact.

Two days later, Lethem again attempted to circumvent the confirmation process by claiming to the accountant that "[O'Hare] never received this email ..can you resend asap so I can get it signed and returned by pat?"  A staff staff accountant with Marcum then sent a blank confirmation form to O'Hare, copying Lethem.  Lethem then forwarded this unsigned confirmation to Sirotka.  Lethem exchanged phone calls with Sirotka following this email and Sirotka then spoke by phone with O'Hare.  O'Hare refused to sign the confirmation.

O'Hare then had dinner with Palleschi in Florida.  During this dinner, Palleschi brought up the MNS confirm.  After O'Hare told Palleschi he would not sign it, Palleschi called O'Hare a "cunt" for refusing to sign.

Thereafter, Lethem emailed Palleschi "Mns confirm..should I just send plan b?" and forwarded an MNS confirmation purportedly signed by O'Hare with the note "plan b…".  This signed confirmation contained the following signature:

The invoice balances due to FTE Networks, Inc. show above as of December 31, 2016 are correct
with the following exception(s) [if any]:_____

Specific sale or payment terms [if any]:_____

Signature:_____

Title:_____

Date:_____

O'Hare did not sign this confirmation.

Palleschi and Lethem spoke by telephone for nine minutes immediately after Lethem sent

this confirmation to Palleschi. A few minutes after the call ended, Lethem sent Palleschi a

different version of the MNS confirmation purporting to be signed by O'Hare:

The invoice balances due to FTE Networks, Inc. show above as of December 31, 2016 are correct
with the following exception(s) [if any]:_____

Specific sale or payment terms [if any]: Will be Paid by 8/1/17

Signature:_____

Title: SVP

Date: 4/25/17

O'Hare has confirmed that he did not sign this second version of the confirmation either.

Lethem and Palleschi subsequently had several additional phone calls that day. Later that

evening, Lethem emailed this false confirmation to Marcum. The following day Auditor-1

followed up with an email to Lethem and Palleschi questioning why the MNS invoices had not

been paid. Following an exchange with Lethem in which Lethem provided false explanations for

why the invoices had not been paid, Auditor-1 replied "Ok I am good." Palleschi and Lethem

expressed surprise, with Palleschi forwarding Auditor-1's email to Lethem with the note

35

"Really??? WOW" and Lethem, replying "Holy fuck."  Records from Marcum confirm that the fraudulent revenue from Marcum reflected in the Purported MNS Invoices was included as FTE's revenue in FTE's 2016 and 2017 financial statements.

### 3.  Embezzlement

Palleschi used FTE's corporate jet that it leased from NetJets Aviation, Inc. to take his and Sirotka's families on a vacation to Peru and to travel to and from his vacation home in Watertown, New York from July 2017 to September 2018.  The NetJets invoices indicate the total cost of these trips was $546,846.75.

Palleschi and Lethem also caused FTE to transfer $100,000 to Lethem in 2018, with the understanding that Lethem would use the money to buy FTE shares in his name.  They did so in an effort to prop up FTE's share price.  Lethem bought the shares but returned them when he resigned.

### 4.  Other Frauds

#### a. NetJets Balance Sheet Manipulation

Lethem manipulated FTE's balance sheet by altering a statement from NetJets to make it appear as though FTE had a large credit balance with NetJets when FTE actually owed money to NetJets.  On January 24, 2018, NetJets emailed Lethem and Palleschi an account statement which identified a balance due of $48,395.34.  On April 16, 2018, the day before FTE planned to file its 2017 Form 10-K, Lethem scanned and sent to his FTE email account what appears to be a statement from NetJets dated January 24, 2018.  This statement, however, showed a credit balance of $463,678.68.  Records from NetJets confirm that this statement was fraudulent. Lethem forwarded the fake NetJets statement to Palleschi and FTE's outside auditor later that day with the note "Net jets statement thru rest of December."

### b. Failure to Remit Payroll Taxes and FICA

On three occasions, once in June 2017 and twice in August 2017, FTE missed the deadline to fund payments to ADP, its payroll company for its biweekly payroll. It instead paid its approximately 25 active employees, which figure does not include Benchmark or Jus-Com employees, their net pay by direct wire transfer. As a result, various employment and tax filings such as employee Forms W-2 and IRS Forms 941 were incorrect for the year 2017 because they did not include amounts paid to the employees for the three pay periods. Thus, Lethem and others at FTE improperly caused FTE to fail to pay over payroll taxes it withheld from its employees, in violation of 26 U.S.C. § 7202, among other violations. FTE's Human Resources manager raised the issue with Lethem on multiple occasions, but Lethem took no action.

FTE told its employees that the wages they received for those three pay periods would eventually be reported to the Internal Revenue Service as if it had been paid in 2018. On March 2, 2018, Sirotka sent an email to all employees stating that the amounts paid during the three payroll periods "will be reflected on the W-2s you will receive for 2018. Providing you with these amounts in 2018 will adjust your records appropriately and not impact your 2017 W-2. Therefore the W-2 you received for the past year is correct . . ." Employees were directed to contact Lethem with any questions or concerns.

### c. Theft of Benchmark Subcontractor Funds

New York law requires general contractors to retain on hand sufficient cash to pay all outstanding bills from their subcontractors. Palleschi and Lethem caused Benchmark Builders, Inc., a Manhattan general contractor that FTE acquired in 2017, to transfer funds to FTE that New York law required Benchmark to hold in reserve to pay subcontractors. Both Palleschi and Lethem have pleaded guilty in Supreme Court, New York County, to attempted grand larceny as a result of this conduct. They are both awaiting sentencing.

### d. *Ballot Box Stuffing*

As part of their cooperation, Palleschi and Lethem described a scheme in which they and others issued FTE treasury stock to Palleschi and his friends to ensure that Palleschi was re-elected the Chairman of FTE's Board of Directors. The documents confirm that on October 11, 2018, FTE issued approximately 3.5 million shares to Palleschi, Lethem, Sirotka, and three members of FTE's Board of Directors, as well as some consultants who had given their voting rights to either Director-1 or Sirotka by written proxy.

Palleschi, Lethem and the others feared in the second half of 2018 that the former principals of Benchmark, who held a significant number of shares after FTE acquired Benchmark, would combine with convertible lenders to vote Palleschi out as Board chairman. According to Palleschi, FTE's outside counsel advised Palleschi to issue as much stock as possible to ensure that 51% of the outstanding shares were held by those friendly to Palleschi.

Accordingly, Palleschi caused approximately 3.5 million shares to be issued to his associates, in many cases without any consideration. At the time, FTE had approximately 8 million shares outstanding. The issuances were never approved by the Board of Directors.

FTE's third quarter Form 10-Q, which was issued on November 19, 2018, falsely described the issuances as being pursuant to consulting agreements or employment agreements. Instead, Palleschi, Lethem and others issued as many shares to friendly parties as they properly could under consulting or employment agreements and then just issued additional shares without consideration to friendly parties as they deemed necessary. For example, Palleschi, together with an investment entity controlled by his wife, were entitled by agreements to a combined control of 25% of the company. As a result, the shares Palleschi and this entity received were properly subject to these agreements. Director-1, however, received more than she should have. She was entitled by agreement to hold 2% of the outstanding shares of the company, or approximately

260,000 shares as of October 2018, but received 440,051 shares. As a result, she owned more than 200,000 shares above her 2% guarantee. At a reported cost basis of $10.51 per share, Director-1 therefore received more than $2 million to which she was not entitled, albeit in restricted shares. Lethem was entitled to approximately 160,000 shares but received more than 350,000. Two independent directors were entitled to preferred shares and options but received 231,226 and 455,051 shares respectively. An FTE consultant was supposed to receive 70,000 shares in January 2019 but those shares were issued to him three months early.

According to Palleschi, the original intent was for the recipients to return the shares once the vote was held on December 26, 2018. The convertible note fraud came to light a few weeks after that election and the shares were returned after Palleschi was fired.

## II. Calculation of Loss Amount

We have calculated the losses attributable to Lethem to exceed $13 million as set forth below:

| | |
|---|---|
| $10,894,561.00 | Loss Due to Convertible Note Fraud |
| $ 2,100,000.00 | Estimated Loss Due to Revenue Recognition Fraud |
| $ 100,000.00 | Payment to Lethem to Manipulate Share Price |
| $13,094,561.00 | |

The loss from the convertible note fraud represents the loss to FTE from its issues of shares to convertible lenders at discounted prices resulting from conversions. For example, FTE issued a convertible note to Adar Bays on January 17, 2017 in a principal amount of $137,500. On September 1, 2017, Adar Bays converted 3,000 shares to pay down $15,000 in principal. The price per converted share was $5. The closing share price of FTE on that day was $12 a share. As a result, Adar Bays received a discount of $7 a share, or a total discount for the 3,000 shares of $21,000. The conversion features of all convertible notes that led to the $10,894,561 loss were undisclosed.

The estimated loss from the revenue recognition fraud represents the change in market capitalization that would have occurred had the company not included the $13.1 million in fake revenue and thereby missed its 2018 annual revenue guidance figure of $350 million. For the first three quarters of 2018, the company reported a total of $263.7 million in revenue. Assuming that figure would have consisted of 75% of the annual reported revenue had the fraud not been discovered before fourth quarter revenue was reported, the annualized 2018 revenue would have been $351.6 million. Subtracting out the false $13.1 million in revenue results in actual revenue for the first three quarters of $250.6 million or $334.1 million on an annualized basis. Had FTE reported that annual revenue figure for 2018, it would have missed its annual revenue guidance by $15.9 million.

To calculate what the impact an announcement of a $15.9 million miss from guidance would have been, the Government looked to the impact of the company's February 26, 2019 announcement that it had secured $116 million in new contracts. The Government engaged in an event study analysis to estimate that the abnormal share price increase, meaning the change in share price not explained by market and industry factors, to be $1.24 per share. That resulted in an increase in market capitalization of $15.1 million. Dividing the market capitalization increase of $15.1 million by the $116 million in anticipated new revenue results in an estimate that for every dollar of expected new revenue, the share price increased by .13 per share. Assuming that the share price would move the same way to the miss from guidance, which would have been reported at approximately the same time, the $15.9 million miss times .13 per share equals a market capitalization loss of approximately $2.1 million per share.

The $100,000 figure represents money transferred to Lethem with the expectation that Lethem would purchase company shares with the money in an effort to prop up FTE's share

price.

### III.  Guidelines Calculation

The applicable Guidelines range is 292 to 365 months, based on offense level of 40 and a criminal history category of I.

The Government calculates an offense level of 40 based on the following:

1.  The applicable Guideline section is Section 2B1.1.

2.  The base offense level is 7 because the statutory maximum for the most serious offense of conviction, securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, is 20 years.  U.S.S.G. § 2B1.1(a)(1).

3.  The loss was greater than $9.5 million and less than $25 million.  Accordingly, the offense level is increased by 20 levels.  U.S.S.G. § 2B1.1(b)(1)(K).

4.  The offense involved 10 or more victims, namely its 426 shareholders as of March 8, 2019. Accordingly, the offense level is increased by 2 levels.  U.S.S.G. § 2B1.1(b)(2)(A)(i).

5.  The offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.  Accordingly, the offense level is increased by 2 levels.  U.S.S.G. § 2B1.1(b)(10)(C).

6.  The offense substantially jeopardized the solvency or financial security of an organization that was a publicly traded company.  Accordingly, the offense level is increased by 4 levels. U.S.S.G. § 2B1.1(b)(17)(B)(ii)(I) and Application Note 14(B)(ii)(VI) and (III).

7.  The offense involved a violation of securities law and at the time of the offense, the defendant was an officer of a publicly traded company.  Accordingly, the offense level is increased by 4 levels.  U.S.S.G. § 2B1.1(b)(20)(A)(i).

8.  The defendant was an organizer and leader of a criminal activity that involved five or more participants and was otherwise extensive.  Accordingly, the offense level is increased by 4 levels. U.S.S.G. § 3B1.1(a).

9.  Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a).  Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter pleas of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

10. The defendant does not qualify for the adjustment set forth in Section 4C1.1 because he received an adjustment under Section 3B1.1.

Accordingly, the total offense level is 40.[8]

## IV.  **Motion Pursuant to Section 5K1.1**

The defendant has provided substantial assistance in the investigation and prosecution of others who have committed offenses.  Accordingly, the Government intends to move at sentencing that the Court depart downward to reflect that cooperation, assuming that the defendant continues to comply fully with the terms of his cooperation agreement.

The defendant began to cooperate in May 2022.  He met with the Government four times in May and June of 2022.  Lethem was forthcoming in these meetings and readily admitted his guilt.  He became the second FTE defendant, after Moser, to enter guilty pleas and cooperate.

Lethem offered testimony that, had he testified, would have been useful in several respects.  He offered the only direct evidence the Government had at the time of the conscious decision by Director-1 and Palleschi to rely on a materiality theory in order not to disclose the convertible features of the debt and Director-1's subsequent admission to him that she understood FTE was not accounting properly for its debt.  Lethem therefore could have debunked attempts by others to pursue a reliance on counsel or a reliance on auditor defense.  Lethem also provided narration of events on which the Government had previously relied only on documents or inference, including Palleschi's involvement in the fake Board member signatures; efforts by Director-1 and Palleschi to hide the convertible debt from Lateral and potential lenders; the spreadsheets of convertible debt prepared by Company Counsel-1 that were distributed to

---

[8] The Probation Office has calculated a final offense level of 39.  Probation has included a 3 level enhancement for role in the offense, rather than 4.  While the Government believes that a 4 level enhancement is appropriate, it would not object if the Court imposed a 3 level enhancement.

Director-1 and Palleschi; Palleschi's and Sirotka's participation in the fake AT&T email; and Palleschi's participation in the forged MNS confirmation. He explained the unbilled revenue fraud more clearly than Moser and corroborated Moser on that topic. Lethem also described Palleschi's embezzlement and his testimony would have been the only direct evidence the Government had of the non-business purposes for all but one of Palleschi's NetJets trips.

Lethem also opened new areas of investigation for the Government. Most significantly, he offered significant evidence of Director-1's knowing participation in the conspiracy.[9] He brought the ballot box stuffing incident to the Government's attention and confirmed what had previously only been the Government's suspicion that FTE tried to manipulate its share price by transferring cash to executives and promotors to be used to purchase stock on the open market.

After Lethem entered his guilty pleas in May 2023, Sirotka pleaded guilty the next month and Palleschi pleaded guilty in August 2023. The Government believes that Lethem's earlier pleas and cooperation were material factors in the decisions of Palleschi and Sirotka to plead guilty as well.

Section 5K1.1 sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has provided substantial assistance. U.S.S.G. § 5K1.1(a). The application of each of those factors to the defendant's cooperation is set forth below.

### A. *Significance and Usefulness of the Defendant's Assistance*

As noted above, Lethem's guilty pleas were material factors in the subsequent decisions of Palleschi and Sirotka to plead guilty, thus ensuring their convictions and saving the

---

[9] The Government has chosen not to charge Director-1. The Government's decision has nothing to do with concerns regarding Lethem's credibility.

Government the considerable resources it would have taken to try this case.  Further, Lethem's cooperation was a significant factor in the investigation of Director-1 and, had she been charged, the Government would have called Lethem to testify in her trial as well.  As described above, Lethem and Palleschi were the only eyewitnesses to much of the evidence implicating Director-1.  Finally, Lethem brought the ballot box stuffing scheme to the Government's attention.  The Government was not even aware of this scheme until Lethem brought it up during one of his proffer sessions.  Lethem also confirmed the Government's suspicions about the scheme to manipulate FTE's share price.

### B.  *Truthfulness, Completeness and Reliability of the Defendant's Information*

Lethem was truthful with the Government during his proffers and period of cooperation.  The information he provided was, in many instances, corroborated by other information or otherwise simply made sense.  For example, the Government was able to corroborate Lethem's information about the ballot box stuffing scheme with the transfer agent records and, subsequently, through witnesses who admitted they had received shares to which they were not entitled.

### C.  *Nature and Extent of the Defendant's Assistance*

The defendant was available at all times requested by the Government and answered every question.  He was prepared to testify against his co-defendants if called upon to do so.

### D.  *Risk of Injury to the Defendant or His Family*

This was a white collar case.  The Government is not aware of any risk incurred by the defendant or his family as a result of his cooperation.

### E.  *Timeliness of the Defendant's Assistance*

The defendant's cooperation was timely.  He began to cooperate well in advance of any trial and well in advance of the expiration of the statute of limitations.

## V. RESTITUTION

Lethem should pay restitution pursuant to 18 U.S.C. §§ 3663 and 3663A in a total amount of of $12,994,561.00 as follows:  a) $10,894,561.00 to FTE, which is the loss to FTE from the convertible note fraud as described above; and b) $2,100,000.00 to the shareholders of FTE at the end of the fraud in March 2019 other than Lethem, Palleschi, Sirotka, Moser and an entity controlled by Palleschi, which figure is the market capitalization loss from the revenue recognition fraud.  Lethem returned the stock he bought with the $100,000 payment that is the third component of his loss amount.  Payments should be distributed on a pro rata basis between FTE and the shareholders based on the respective loss amounts of $10,894,561 and $2,100,000.  Payments to the shareholders should be distributed on a pro rata basis based on the number of shares they owned as of March 2019.  While the amounts due to some shareholders will be so small as to be impractical to pay, many of the shareholders will recover significant amounts if the $2,100,000 due to the shareholders is paid in full.  Restitution should be joint and several in full with Palleschi and in part with Sirotka and Moser up to the amounts of their respective liabilities.

The Government will submit a proposed restitution order.

## VI. CONCLUSION

In light of the above, and assuming that Lethem continues to comply with the terms of his cooperation agreement, the Government intends to move at sentencing that the Court sentence Lethem under the factors set forth in U.S.S.G. § 5K1.1.

Respectfully submitted,

JAY CLAYTON
United States Attorney

/s

By: _____
Peter Davis
James McMahon
Assistant United States Attorney

Dated:    May 6, 2025
          New York, New York

cc: Defense Counsel (by ECF)