UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                                       :

UNITED STATES OF AMERICA        :

                                        :

     - v -                           :               21 Cr. 454 (CM)

                                        :

ANTHONY SIROTKA,               :

                                         :

                    Defendant.     :

                                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


### GOVERNMENT'S SENTENCING MEMORANDUM
### AND MEMORANDUM IN SUPPORT OF A MOTION FOR
### <u>A DOWNARD DEPARTURE PURSUANT TO U.S.S.G. § 5K1.1</u>


                                       JAY CLAYTON
                                         United States Attorney for the
                                         Southern District of New York


PETER DAVIS
JAMES MCMAHON
Assistant United States Attorneys

- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                       :

UNITED STATES OF AMERICA      :

                                       :

     - v -                        :          21 Cr. 454 (CM)

                                       :

ANTHONY SIROTKA,         :

                                       :

                 Defendant.    :

                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT'S SENTENCING MEMORANDUM
AND MEMORANDUM IN SUPPORT OF A MOTION FOR
<u>A DOWNARD DEPARTURE PURSUANT TO U.S.S.G. § 5K1.1</u>

The Government respectfully submits this sentencing memorandum in connection with the sentencing of Anthony Sirotka, now scheduled for November 12, 2025 at 11:30 AM.  The defendant has provided substantial assistance to the Government in the investigation and prosecution of others.  Accordingly, assuming he continues to comply with the terms of his cooperation agreement, the Government intends:  1) to move for a downward departure pursuant to U.S.S.G. Section 5K1.1; and 2) to move pursuant to 18 U.S.C. § 3553(e) to permit the Court to impose a sentence below the mandatory minimum two year term that would otherwise apply to Count 5 pursuant to 18 U.S.C. § 1028A.

## I.  Background

### A.  The Company and its Leadership

FTE Networks was a telecommunications company based in Naples, Florida.  The company had revenue of approximately $12 million and an operating loss of $1.6 million for the 2016 calendar year.  In April 2017, FTE completed a leveraged acquisition of Benchmark Builders, Inc. for approximately $75 million.  Benchmark had historical revenue between $300

million to $400 million.

Prior to December 2017, FTE's common shares traded on the OTCQX market.  After FTE acquired Benchmark, the company's stock traded on the NYSE American exchange.  The company's common stock was suspended from trading on the NYSE in December 2019 because FTE had violated NYSE rules by issuing additional shares to support convertible debt without shareholder approval and by failing to submit listing applications for those shares.  The company's stock was subsequently delisted from the NYSE.

Defendant Anthony Sirotka served as FTE's interim Chief Executive Officer from January 2019 to October 2019.  Prior to that, he served as the company's Chief Administrative Officer, senior vice president of business development and chief business development officer.  Before joining FTE, Sirotka was principal of a telecommunications firm, and also served as the senior Northeast program manager with Level 3 Communications.  He is a graduate of the New York Institute of Technology.

Michael Palleschi was the chairman of FTE's Board of Directors and its Chief Executive Officer from January 2014 to January 2019.  The Board of Directors placed him on leave in January 2019 and he resigned from FTE in May 2019 after being told that FTE was not renewing his employment agreement.  Before joining FTE, Palleschi was Chief Operating Officer at a venture capital fund focused on telecommunication companies and held various senior management roles at several major telecommunication companies.   The Court sentenced Palleschi primarily to 12 years' imprisonment on September 25, 2025.

David Lethem was FTE's Chief Financial Officer from June 2014 to March 2019, when he resigned.  Before joining FTE, Lethem was the Director of Finance and Audit for an auditing firm.  Lethem holds a Master of Business Administration from California Coast University.

Lethem cooperated with the Government and the Government moved for a downward departure in his sentence pursuant to U.S.S.G. § 5K1.1.  The Court sentenced Lethem primarily to four years' imprisonment in May 2025.

Daniel Moser, who will be sentenced by Judge Abrams in December, was FTE's controller from April 2017 to May 2019.  Moser is not a certified public accountant.  Before he worked at FTE, Moser worked as a restaurant manager and as a controller and cash accountant for various truck and car dealerships.  Moser was Lethem's neighbor.  When FTE bought Benchmark Builders in the spring of 2017, Lethem offered Moser the FTE controller's position for $100,000 a year.  Moser described his duties at FTE as handling the trial balance and the balance sheet and reconciling assets and bank statements.

### B.  The Fraud

Sirotka, together with Palleschi, Lethem, Moser, and others, engaged in a revenue recognition scheme at FTE. In addition to being the primary drivers of the revenue recognition scheme, Palleschi and Lethem also caused FTE to fail to disclose derivative liabilities and expenses arising from FTE's issuance of 71 convertible notes with a total principal amount exceeding $22 million from 2016 to early 2019.  The convertible note fraud led to a $10.9 million loss to FTE.  Both Palleschi and Lethem also attempted to manipulate FTE's share price and further engaged in a scheme to issue shares, often without consideration, to individuals loyal to Palleschi to ensure Palleschi's re-election as chairman of FTE's Board of Directors.  Palleschi, with Lethem's assistance, also embezzled funds for his personal use from FTE.  Sirotka's involvement was limited to the revenue recognition scheme as described herein.

Sirotka and the other conspirators caused FTE to fraudulently recognize more than $12.5 million in revenue in 2016 through 2018 for work the company never performed.  The scheme

with respect to Sirotka involved two sets of fictitious revenue:  1) approximately $10 million in fabricated revenue as of 2018 supposedly earned from services performed for AT&T for which FTE never billed AT&T; and 2) approximately $2.5 million in a fabricated "miscellaneous" receivable purportedly earned from services performed for AT&T and others in 2017.[1]

Although Palleschi at the time compared the materiality of the fake revenue to "a chair off the Titanic," it was clearly material.  For the year ended December 31, 2016, FTE's financial statements overstated the company's revenue by approximately 108% and accounts receivable by approximately 477%.  For the each of the quarterly periods in 2017 and 2018, FTE's financial statements overstated the company's accounts receivable by between 18% and 120%.

Although the revenue recognition fraud impacted all shareholders, Lethem told the Government that it was intended to be heard primarily by the former Benchmark principals, who had sold their successful construction company to FTE mostly in exchange for convertible promissory notes and FTE common stock.  Palleschi did not want the former Benchmark principals, who were still operating Benchmark on a daily basis, to know that their only realistic hope of payment on their notes was revenue generated by their efforts at their former company. He was so concerned that the former Benchmark owners would vote him out as Board chair that he handed out free shares -- and their corresponding votes -- to his allies to ensure his re-election. Palleschi's fear was well founded, given that he was terminated after Moser revealed just part of the truth about FTE's financial condition to Benchmark's former owner.  The revenue recognition fraud was, therefore, Palleschi's attempt to avoid that fate, which succeeded at least for a while.

---

[1] At Palleschi's direction, Lethem forged the signature of an FTE customer on an audit confirmation to create the false appearance that the customer owed FTE approximately $600,000.  The false audit confirmation enabled FTE to avoid a write-off of this receivable and its corresponding earnings reduction of $600,000.  Sirotka played no role in the forgery.  Thus, the amount of revenue involved in his revenue recognition fraud is lower than that for Palleschi and Lethem and his loss amount for that part of the fraud is correspondingly lower.

### a.  Unbilled Revenue from AT&T

In or about February 2016, Jus-Com, Inc., the FTE subsidiary that installed cable networks, entered into an agreement with AT&T which provided for Jus-Com to perform work for AT&T in two stages.  First, Jus-Com would conduct site surveys of apartment complexes to estimate the cost of installing cable.  Jus-Com was paid $1,200 for each of these surveys.  Second, after Jus-Com provided AT&T with the results of the site surveys, AT&T would issue a purchase order if it wished to proceed with the actual work.

Almost all the work Jus-Com did for AT&T consisted of the $1,200 site surveys instead of actual work at project locations.  AT&T paid Jus-Com approximately $2.5 million from 2016 through 2018.  Jus-Com's agreement with AT&T required AT&T to pay for site surveys and any other work performed within 30 or 60 days.  According to Sirotka, AT&T paid its bills in accordance with the agreement.

### (1)  The 2016 Form 10-K

FTE recognized approximately $5.8 million in fake revenue for the calendar year 2016, the majority of which it claimed it had performed but not yet billed to AT&T.  In preparation for FTE's 2016 year-end audit, FTE provided Marcum with a spreadsheet listing $8.8 million in fabricated unbilled revenue from several customers, including AT&T.  Throughout April 2017, Marcum repeatedly requested documents to confirm that FTE had completed the work identified on the spreadsheet so that the revenue could be recognized.  Palleschi, Lethem and Moser first falsely told Marcum that there were no documents to show FTE had done the work and later provided fake documents to prove it had.

For example, on April 13, 2017, Moser told one of its outside auditors from Marcum LLP ("Auditor-2") that FTE could only calculate unbilled revenue through an arithmetic formula that

considered FTE's expenses and its historical gross margin of 38%.  Moser acknowledged that "this makes it very hard to audit."  At Lethem's direction, Moser also sent an email to Marcum stating that FTE's internal systems did not allow the Company to provide more concrete support for the unbilled revenue, such as purchase orders by which particular jobs could be audited.  No purchase orders existed to support much of the unbilled revenue because the work had not been performed.

Marcum's partner on the FTE engagement ("Auditor-1") continued to question the large amount of unbilled revenue.  Moser then emailed Lethem stating that there was "[n]o where to go" on the unbilled revenue and quit FTE, although he rejoined FTE a few months later.  In a series of emails after he quit, Moser remonstrated with Lethem concerning FTE's reporting of fake revenues.  For example, on April 19, 2017, he wrote:

> You and I both recognize there is a minimum of 2,000,000 of loss that is sitting in your [cost of good sold] and has been cover [sic] by unbilled revenue.  [Auditor-1] at least suspects this but while not being willing to allow the exaggerated revenues is willing to let you hide it for now in a prepaid account. At this point it is anyone's guess whether you have to restate the 3rd qtr Q.

On April 27, 2017, Moser emailed Lethem explaining that, to avoid FTE's late filing of the Form 10-Q for the fourth quarter of 2016, "[a]ll we needed to do really was get around the unbilled. That and the 600,000 [in unpaid invoices supposedly issued to MNS]."  The following day, April 28, 2017, Moser followed up in an email to Lethem that there was "no justification for even 5 mil of unbilled in the 4th qtr" and that it should not be Lethem's responsibility "to make them [the numbers] real."  Moser continued that "I suspect through no fault of your or your people the Q will be late as it should be with no true revenues, or detail to support it!"  Moser encouraged Lethem to "Make your numbers real!"

On May 4, 2017, Auditor-1 emailed Palleschi and a member of FTE's Board of Directors

("Director-1") regarding the unbilled and stating that "David [Lethem] . . . tells me the company has no documentation to support that the work was done.  I find that hard to believe . . ." and again requesting support for the unbilled revenue.  At this point, Palleschi and Lethem prepared and sent Auditor-1 a fraudulent spreadsheet containing a list of projects FTE had supposedly performed for AT&T and fake revenue amounts for those projects.

Auditor-1 and Auditor-2 asked Lethem, Palleschi and Director-1 the next day for backup documents to support the revenue for randomly chosen projects contained on the spreadsheet. Six days later, an FTE vice president emailed Auditor-1 and then Palleschi eight screenshots of an internal FTE database containing price quotes pertaining to eight of the projects Marcum had selected for testing from the fraudulent spreadsheet Palleschi and Lethem had given to Marcum. At Palleschi's request, the Vice President also forwarded to Lethem a set of approximately 29 invoices from FTE to AT&T relating to the projects listed on the spreadsheet.  These invoices were fraudulent in that the purported services described in them had never been performed.

FTE's 2016 Form 10-K, filed on May 11, 2017, included approximately $5.8 million in fictitious revenue listed on the fraudulent spreadsheet discussed above.  FTE's total revenue as listed on the Form 10-K was $12,269,079.

### (2) The 2017 Forms 10-Q

On May 23, 2017, Moser emailed Auditor-1, copying Lethem and Palleschi, a spreadsheet listing a total unbilled revenue as to AT&T of approximately $4.4 million, decreased from the starting $5.8 million figure supposedly because some of the unbilled revenue had been billed in the first quarter of 2016.  Lethem emailed Auditor-2 on May 22, 2017 stating that "there was no [work in progress] added for this quarter at all."  On May 25, 2017, FTE filed its first quarter 2017 Form 10-Q, listing accounts receivable of $9,984,873 as of March 31, 2017 but not

indicating how much of this was unbilled revenue.

FTE's general ledger recognized an additional $1.7 million in unbilled revenue in the second quarter of 2017. In preparing FTE's second quarter Form 10-Q, Marcum questioned the substantial amount of unbilled revenue remaining on FTE's books and why those services could not be billed. Moser suggested to Lethem that FTE reply "[a]s you are aware we have had some issues with AT&T being very difficult to get approval from to close jobs and get them invoiced" and that "[f]or whatever the reason AT&T's system doesn't accept our requests to close these projects . . . Perhaps we say we are finished and they say not." Right below this draft email, Moser wrote a note to Lethem stating, in pertinent part:

> This is the very best story I could come up with. At this point they are all still good receivables. Just my story, I realize you would know much better than I whether a story such as this would help or hurt. Was thinking if you could sell it with the promise that they will be gone for the next Q, [Auditor-1] might let it ride, tell Mike its going to happen so he better get with Lynn and find some new unbilled and a significant amount of revenue. . . .

On August 21, 2017, Moser, copying Lethem, emailed Marcum a spreadsheet that listed additional unbilled revenue for AT&T of approximately $4,120,140, bringing the total fraudulent unbilled revenue to approximately $10,077,000. The same day, FTE filed its second quarter 2017 Form 10-Q reflecting that number.

The following day, August 22, 2017, Moser sent Lethem an email stating that, while he had followed Lethem's direction to provide Marcum support for the unbilled receivables, he was "concerned about their legitimacy":

> wanted to bring to your attention what appeared to both [Marcum] and I to be obvious inconsistencies in the collection and reporting of the Unbilled by the field Ops. I wanted to make sure you were aware that I have no paper trail to document the data that was reported on the unbilled outside of the Charter Invoices. A large portion of the unbilled appear to have aged significantly. As such having no indication of why these have not been paid I am obviously concerned about their legitimacy and our ability to convert them to collectible invoices.

Moser forwarded this email from his FTE email account both to his personal email account and to his wife with the note "If he gets confrontational I am going to quit and will most likely be a whistleblower. These guys are slippery which makes me very uncomfortable."

In September 2017, Moser told Lethem that "[f]or the record, I will have absolutely nothing to do with Unbilled for the 3rd Qtr., unless of course they are legit.  So please do not ask."  FTE's third quarter Form 10-Q, filed on November 16, 2017, listed substantial sums as accounts receivable, but did not identify any of this revenue as unbilled.

### (3)  The 2017 Form 10-K

As of December 31, 2017, unbilled accounts receivable totaled $10,077,201.

In February 2018, Moser emailed Lethem "[u]nbilled need to just be what they are. . . . Maybe you are going to have to take the hit. You have to make the unbilled an operational problem. Mike Palleschi needs to be the heavy on this. He needs to be all over Anthony [Sirotka], and gets us something we can makes some kind of sense on.  . . .. "[Palleschi] needs to understand this was wrong and we as a company listed on the NYSC [sic] can not [sic] ever do this again."

In late March 2018, Lethem and Palleschi together told Moser that they had found additional unbilled revenue and that they needed to come up with support for $4.2 million in unbilled revenue.  The $4.2 million figure was the approximate sum of 21 sample projects Marcum had selected for testing.

Shortly after Moser spoke with Palleschi and Lethem, FTE employee T.S. gave Moser a zip drive containing false documentation of unbilled AT&T revenue.  Moser used these documents to create a spreadsheet showing total unbilled revenue of $10,054,428, which was approximately $22,000 less than the previous unbilled revenue figure.  Rather than write off the

9

old and false unbilled revenue and then recognize new and false revenue, Moser made a $22,000 entry in the unbilled account to adjust the old unbilled figure of roughly $10,077,000 to the new unbilled figure of $10,054,000. Approximately a week later, on April 8, 2018, Moser referenced the switch from one batch of $10 million in unbilled receivables to the other, in an email to Sirotka and Palleschi, saying "The other concern is the impact or lack of impact to cash for the $10.3 million of prior unbilled that we are no longer claiming from prior quarters."

Lethem sent an "unbilled worksheet" to Auditor-1 and Director-1 showing this new and false unbilled revenue as of December 31, 2017. The spreadsheet contained a tab listing 95 "project codes," along with purchase order numbers, dates, and amounts for each project. At Lethem's direction, Moser uploaded to Marcum the records from T.S.' thumb drive as supposed backup for the AT&T unbilled revenue.

On March 30, 2018, Auditor-1 emailed Lethem, Palleschi and Director-1 stating that he had just spoken by phone with Moser who told Auditor-1 that FTE did not have sufficient documentation to support unbilled revenue FTE was reporting. Auditor-1 went on to say that "[t]hat is what we went through last year . . . " Lethem responded that Sirotka and T.S. did have documents showing that "AT&T signed off that the work was done" and that FTE would forward the records. Lethem also forwarded Auditor-1's March 30, 2018 email to Moser asking "Is this true? Why would u say that?" Moser's reply reflects the need for FTE to tell "stories" to substantiate the unbilled revenue:

2. **Proof of completed work.** Told him that this would come from Ops. If that means I don't have it, it is because I don't have it. He's a smart guy and figured out that if it needs to come from Ops I most likely do not have it and I don't. He indicated that he thought Tony had it on his computer. I spoke with Anthony and told him that Alan was wanting proof of completion. Asked Anthony if perhaps we could use the same document that was used for proof of completion on the sight survey's.(contains the Proj ID) Never ever said we do not have proof of completion. He was going to call Mike and I believe he is working on that now. I am thinking maybe he would accept the second file which shows the job uncompleted but I am not his mind reader. I do not have proof of completion. Only Anthony would have that at this point or why would we not have billed it. You put me in the middle of a firestorm and want to treat me like I lit the fire. Really. Goes back to what I told you on the phone. We can tell a couple of stories but they better all be the same one. These problems were not created by me!

Less than a week later, Moser sent Lethem an email with the subject "My Future with FTE," in which he expressed disappointment that he did not receive a raise. Moser stated "[u]nfortunately for me I know it all. I have to deal with the bullshit and try and balance my own integrity each and every day." Moser further said:

> You need someone who knows but does not tell. That would be me. While I am not willing to participate in the gray I am willing to overlook it so long as it does not have legal ramifications to me. In other words there is a huge difference between lying and overlooking and keeping ones thoughts to himself.

On the same day, a Marcum auditor asked Lethem, Moser and an FTE internal accountant ("Accountant-1") for supporting documentation for the 21 unbilled projects totaling approximately $4,295,069 Marcum had randomly chosen for further testing. Moser, Accountant-1 and T.S. responded with purchase orders for the $1200 site surveys for the 21 projects. The documents did not provide support for the larger sums FTE had claimed in the spreadsheet. Auditor-1 replied that this "looks like this is just the support for the $1200 not for the other work invoiced."

On April 6, 2018, Moser emailed Lethem, Sirotka and Palleschi to say, falsely, that "[t]he issue with these jobs is that you do not get paid until the entire job is completed by all the vendors." This became the conspirators' false explanation for the unbilled status of the fake revenue: that AT&T would not pay any vendor for its work on a project until all vendors on that

11

project completed their work.  Lethem sent the false explanation to Auditor-1, copying Palleschi, on April 15, 2018.

Marcum continued to ask for supporting records.  Sirotka sent Auditor-1, copying Lethem, "screenshots from the operations database reflecting 10 of the MDU construction projects."  The screenshots were from an internal FTE Operations database and listed quotes for 10 of the 21 projects identified by Marcum.  The amounts listed had never been earned by FTE.  Auditor-1 replied that they would reach out "to see what underlying support is for this screen shot like how it ties to the unbilled amount and who enters the dates in the system . . . But this is good."  Palleschi emailed Auditor-1 that Sirotka was "reaching out to the field managers tonight/tomorrow and will get" documentation that FTE had performed the services included in the unbilled revenue.

Lethem then forwarded to Auditor-1, copying Sirotka and Palleschi, five invoices— purporting to be for projects listed on the spreadsheet— totaling $605,759.16 and purportedly issued to AT&T for work that had previously been classified as unbilled.  The invoices described work never performed by FTE for AT&T, listed amounts never authorized by AT&T, and were never sent to AT&T.  Moser later referred to these as "[i]nvoices created to convince the auditors that we had received confirmation on some of the 10,000,000 unbilled."  On or about May 1, 2018, after FTE filed its 2018 Form 10-K, Moser deleted these invoices from FTE's accounting system.  Lethem later directed Moser to add the invoices back in.

On April 13, 2018, T.S. emailed Palleschi and Sirotka 21 fake "Job Completion Notices," for the 21 projects for which Marcum had requested additional support.  FTE did not have such a form.  Instead, the conspirators copied a similar form used by one of FTE's customers to create the false appearance that FTE had completed the work.  Both Sirotka and Palleschi separately

12

forwarded these to Lethem, who forwarded them to Auditor-1, copying Sirotka and Palleschi. The next day, Lethem falsely represented to Marcum in an email that FTE had completed the work as identified in the site surveys:

**From:** David Lethem
**Sent:** Saturday, April 14, 2018 12:26 PM
**To:** 'Lucero, Vanessa' <Vanessa.Lucero@marcumllp.com>; Markowitz, Alan <Alan.Markowitz@marcumllp.com>
**Cc:** Gibson, Kathryn <Kathryn.Gibson@marcumllp.com>; Anthony Sirotka <asirotka@ftenet.com>
**Subject:** RE: Invoices for AT&T Deregulated

Just talked to Anthony...the attached document, which is just one sample, contains all the information we put together from the site survey, which includes the scope of work tab we prepare for att. We tell them what materials, any issues which may be encountered with the building, our work, their responsibilities, etc. This is sent to att and then we start the work, etc.

Anthony...please correct anything per our call just now if im not 100% accurate.

Although Lethem asked Sirotka to "correct anything" inaccurate, he did not do so.  The email was inaccurate because FTE had not performed any of the described work and was not authorized to do any work without first receiving an AT&T purchase order.

The next day, Palleschi, with help from Lethem and Sirotka, drafted an "Unbilled Memo," which contained the false representation that "We are only authorized to bill the customer when all trades have completed all work."  Sirotka, while knowing the memo was false, replied "Looks good."  Palleschi replied "Good with me.  Fire away."  Lethem then uploaded the memo to Marcum's portal and confirmed in an email to Palleschi and Sirotka that he had done so.

FTE's 2017 Form 10-K, filed on April 18, 2018, listed at least $10,077,000 in fraudulent "unbilled" revenue from AT&T.

### (4) FTE's 2018 Forms 10-Q

FTE's first quarter 2018 Form 10-Q included the same $10,077,000 AT&T unbilled receivable as listed in the 2017 Form 10-K.  Moser told Accountant-1 that "[i]n the short time

13

between the K and Q we have had no activity" on the unbilled accounts receivable.

On June 19, 2018, Moser raised emailed Lethem and Sirotka about the problems inherent in carrying the same unbilled figure from quarter to quarter:

We need to have the unbilled from **previous** Quarters resolved by June 30th. From what I can see we have the following issues.

1. 2.5 Mil in Misc Receivables that we have told the auditors we are in discussion trying to collect. We will at a minimum need to show concrete activity toward their collections.
2. 600,000 in a total of 5 invoices there were setup as payment toward the unbilled we submitted on the 10-K. If we are going to be paid on these then we need to be or have an explanation as to why not.
3. 10 million in unbilled from December of which we (see item #2 above) we have billed 600,000. The problem here is that we have shown no payment of any kind toward these.

We have the potential to be forced into a 13,000,000 write-off if we don't get our ducks in row. At this point the office has no ability to respond to any questions that the auditors will most likely have.

As Moser predicted, Marcum questioned in an August 9, 2018 email why the unbilled figure for the second quarter was unchanged from the first quarter. Moser emailed Sirotka, copying Lethem and Palleschi, asking him "to put together some kind of unbilled . . . to get us to at least 600,000 revenue." Moser explained that this additional revenue was needed to replace the roughly $600,000 FTE had supposedly invoiced to AT&T back in April 2018 in an attempt to show some progress in collecting the unbilled. Despite Moser's efforts, FTE included the same $10,077,000 unbilled AT&T receivable in its second quarter 2018 10-Q.

### b. The 2017 Miscellaneous Receivable

FTE's 2017 revenue included a "miscellaneous receivable" in the amount of $2,463,085. This receivable was made up of amounts purportedly due to FTE from various customers, including more than $2 million from AT&T. Moser was never provided any support for this revenue and therefore reversed it as of October 1, 2017. Lethem subsequently directed Moser to re-record the receivable, and Moser did so the same day. On February 5, 2018, Moser emailed Lethem stating "[t]he auditors are already circling on the 2.5 mil wanting to know if these were

14

booked against revenue."

On March 25, 2018, Auditor-1 emailed Palleschi, Lethem, and Director-1 to follow up on a prior email "regarding our request for support for a $2.5M that is currently sitting in other misc. receivable and revenue" which Moser "reversed . . . as there was no support for it, since March 2017, and David [Lethem], CFO, told him to place it back on the books."  Auditor-1 stated that if support was not provided, this receivable would have to be reversed.  Palleschi immediately forwarded this email to Sirotka.

Palleschi, aided by Lethem and Sirotka, created and sent Auditor-1 a fake email from an AT&T employee as support for the miscellaneous receivable two days before FTE filed its 10-K for 2017.  Palleschi forwarded to Sirotka an email an FTE employee had received from R.M., a Senior Contract Manager with AT&T, two years earlier.  The email contained a signature block for R.M., which included R.M.'s phone number and email address.  Palleschi used R.M.'s email[2] to create a fake email stating:

> As we just spoke, thank you for reaching out regarding the outstanding and unbilled T&E projects completed by FTE in 2016/2017.
>
> I will be instructing field personnel to review and approve all outstanding work orders not issued to FTE in relation to the T&E work this week. Understanding this work is in excess of $1,500,000, we will expedite the process and work with you to expedite payments. This may take some time to process as some of these projects are closed out, however we will work diligently to process as soon as possible. Thank you for your patience and continued partnership.

The signature block of R.M. in the fake email omitted R.M.'s phone number and email address. This email created the appearance that AT&T intended to pay the miscellaneous receivable shortly, which meant that FTE could continue to recognize it.

Lethem forwarded this fake email in PDF format to Auditor-1, copying Palleschi and Sirotka.  Shortly thereafter, Auditor-1 asked "Any chance this can be forwarded to me which

---

[2] Palleschi does not recall drafting the fake email but both Lethem and Sirotka said he did.

15

shows the email address is an AT&T email [?]"  Within a minute of receiving this request, Lethem forwarded it to Sirotka with the note "??"  Sirotka then sent Palleschi the fake email in a native email format that did not contain any AT&T email addresses as had been contained in fake PDF email.  Two minutes later, Sirotka, while knowing the email was fake, sent this native version of the fake email to Marcum, copying Lethem and Palleschi, and stating "[h]ere is the original email."

Despite FTE's determined efforts to substantiate the 2017 unbilled receivable, Marcum nonetheless proposed that the receivable be written off in the 2017 audit.  FTE declined to do so, stating in a representation letter dated April 17, 2018 and signed by Lethem and Palleschi that the "total amount of unapproved change orders as of December 31, 2017 are immaterial to the financial statements as a whole."

## II.    Calculation of the Loss Amount

The Government has calculated the loss attributable to Sirotka to be $1,448,407.[3]  This estimate is based on an event study conducted by experts at the Division of Economic and Risk Analysis at the U.S. Securities & Exchange Commission ("DERA").  It represents the decline in market capitalization that would have occurred had the company not included the $12.5 million in fake revenue when it should have announced in the late winter or early spring of 2019 that it had not met its 2018 revenue guidance.  "[C]ourts frequently calculate loss in securities fraud cases 'by relying on the change of market capitalization as a result of the disclosure of the

---

[3] As Sirotka noted in his sentencing memorandum, the Government had provided his counsel with a loss figure of $1,256,023.  That figure was a result of a recent mistake in calculation by Government counsel, not DERA.  DERA had calculated the loss figure for Palleschi and Lethem.  The Government miscalculated when it followed DERA's methodology, described below, to calculate the lower loss for Sirotka.  When Government counsel caught his mistake, he calculated the loss to be $1,448,407.  Considering potential rounding errors, that figure is essentially the same as the $1,488,598 loss figure calculated by Sirotka's expert when the shares held by co-conspirators were excluded from the calculation, as they were in the Government's calculation.

16

fraud.'" *United States v. Kumar,* 617 F.3d 612, 632 (2d Cir. 2010), *quoting United States v. Ebbers,* 458 F.3d 110, 128, (2d Cir. 2006); U.S.S.G. § 2B1.1, Application Note 3(E)(ix).

### A. Applicable Law

A Guidelines loss determination "need not establish loss with absolute precision; it need only permit the district court to make a reasonable estimate of the loss given the available information." *United States v. Coppola,* 671 F.3d 220, 250 (2d Cir. 2012). "[I]t is permissible for the sentencing court, in calculating a defendant's offense level, to estimate the loss resulting from his offenses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown." *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997). "Calculating the amount of loss for purposes of the sentencing guidelines is more an art than a science. Courts can, and frequently do, deal with rough estimates." *Kumar,* 617 F.3d at 632, *quoting United States v. Rostoff,* 53 F.3d 398, 407 (1st Cir. 1995).

### B. Discussion

To set a point in time for its analysis, DERA assumed that the fraudulent nature of the $12.5 million in revenue would have been disclosed in the late winter or early spring of 2019. FTE's Form 10-K for 2018 would have been due on April 15, 2019. FTE disclosed part of its convertible note fraud on March 11, 2019 and part of the revenue recognition fraud in June 2019. DERA determined that without the fraudulent $12.5 million in revenue, FTE would have missed its $350 million revenue guidance for 2018 by $15.1 million.[4] The hypothetical disclosure of the

---

[4] For the first three quarters of 2018, the company reported a total of $263.7 million in revenue. Subtracting out the fake $12.5 million in revenue leaves actual revenue for the first three quarters of $251.2 million. DERA assumed that the revenue figure for the first three quarters consisted of 75% of annual revenue and calculated that annual revenue should have been $334.9 on an annualized basis. Had FTE reported that annual revenue figure for 2018, it would have missed its annual revenue guidance by $15.1 million.

"miss" in revenue in the late winter or early spring of 2019 became the point in time for DERA's analysis.

To calculate what the impact of such an announcement would have been, DERA looked to the impact of the company's February 26, 2019 announcement that it had secured $116 million in new contracts. DERA engaged in an event study analysis to estimate that the abnormal share price increase, meaning the change in share price not explained by market and industry factors, was $1.24 per share.

From there, the Government followed DERA's methodology to calculate the loss in this case as follows:

> 1. The Government determined from records of FTE's transfer agent that convicted defendants Palleschi, Lethem, Sirotka and Moser owned or controlled 1,333,483 shares as of November 12, 2018.
>
> 2. The Government subtracted those shares from the 12,173,173 FTE common shares outstanding as of November 12, 2018, to arrive at a figure of 10,839,690.
>
> 3. The Government multiplied the abnormal share price increase of $1.24 from DERA by the revised number of outstanding shares of 10,839,690 to determine a change in market capitalization for those shares of $13,441,216 from the February 26, 2019 announcement.
>
> 4. The Government divided the market capitalization increase of $13,441,216 by the $116 million in announced new revenue to determine that for every dollar of expected new revenue, the market capitalization increased by 11.59 cents.
>
> 5. Assuming that the share price would move the same way for a disclosure of revenue reversed out due to fraud,[5] the Government multiplied the decrease in share price of 11.59 cents by the $12.5 million in fraudulent revenue to arrive at a loss figure of $1,448,407.

---

[5] Sirotka argues that he is unaware of evidence supporting an assumption that the share price would move in the same way for a negative announcement of a revenue miss as it does for a positive announcement of new revenue. The Government is similarly unaware of any evidence supporting a contrary assumption.

18

### 1.  The $1.9 Million and $1.4 Million Loss Figures

Sirotka correctly notes that this loss figure is lower than the $1.9 million loss figure in the PSR.[6]  The $1.9 million loss figure considered the number of outstanding shares of FTE common stock as of March 8, 2019, while the $1.4 million figure considered the significantly lower number of outstanding shares of FTE common stock as of November 12, 2018, less shares owned or controlled by the convicted conspirators.  The lower number of outstanding shares resulted in lower changes in market capitalization and, therefore, a lower loss figure.

Neither figure is unreasonable.  The calculation using the number of outstanding shares as of March 8, 2019 is reasonable, particularly for those defendants who, unlike Sirotka, participated in the convertible note fraud.  That is because FTE first disclosed its issuance of convertible debt -- the most substantial part of the fraud -- on March 11, only three days later. The benefit of using the number of outstanding shares on November 12, 2018 is that it ensures that only those shareholders who bought or sold shares while unaware of the fraud were counted as victims.  Information about the fraud was slowly bled out into the market starting on January 24, 2019, when the company announced that Palleschi had been put on a "temporary leave of absence," Sirotka was replacing him as the new interim CEO and the chief operations officer had resigned.  The company gave no explanation for these developments.  Although the company did not directly disclose fraud until its convertible note announcement on March 11, its announcement that the CEO and COO were leaving, particularly when no reason was given, was certainly indicative of a serious problem with the company's management.  Using the November number of outstanding shares, therefore, eliminates any concern that shareholders who bought

---

[6] Sirotka also notes that the initial PSR had a loss figure of $2.1 million.  That figure, which Probation probably obtained from the PSRs for Palleschi and Lethem, considered fake revenue relating to Palleschi's and Lethem's forgery of the audit confirmation, in which Sirotka did not participate.  The Government thus recommended to Probation that the loss connected to the forged confirmation be backed out of the calculation.

shares issued after the January 24, 2019 announcement did so while knowing that the company had some sort of serious problem.  It also results in a more conservative loss figure.

### 2.  Sirotka's Objections to the $1.4 Million Loss Figure

Sirotka disputes this loss figure because:  1) it includes the $2.5 million miscellaneous receivable as revenue; 2) it is based on an "entirely unrelated" announcement of new revenue in late February 2019; 3) FTE did not report revenue less than its $350 million revenue guidance because FTE's May 2020 restated financial statements show revenue of $384.8 million for 2018; 4) the Government's calculation "annualized" the false $12.5 million in revenue; and 5) the calculation included fraudulently issued shares in its calculation.  None of these arguments has any merit.

### a.  Inclusion of the $2.5 Million Miscellaneous Receivable

It was appropriate to include the fraudulent $2.5 million miscellaneous receivable in the calculation.  Sirotka argues that by 2018, this receivable was an asset derived from 2017 revenue and therefore should not be considered when evaluating the impact of a shortfall in revenue in 2018.  Sirotka's argument ignores the fact that it was his conduct in the spring of 2018 with the fake email that ensured that FTE continued to recognize the receivable and its corresponding revenue through the audit of the 2017 financial statements and all through 2018 before FTE finally disclosed the revenue recognition fraud in June 2019.  Thus, the calculation's assumption that the fraudulent nature of the $2.5 million receivable hypothetically would have been disclosed in the late winter or early spring of 2019, at the same time that the fraudulent nature of the $10 million in unbilled revenue would have been disclosed, is fair.  At that time, the receivable would have been written off as fraudulent in the 2018 accounting period (the period of the writeoff, which would still have been open), thus reducing earnings by $2.5 million for 2018,

20

which would have had the same practical effect of reducing 2018 revenue by the same amount.[7]

Sirotka's suggestion that the $2.5 million fake receivable be ignored entirely in the loss calculation would mean that he would evade responsibility for Guidelines purposes for his conduct in connection with the fake email.  Notably, he does not offer an alternative calculation that includes the impact on FTE's share price on the disclosure of the fraudulent nature of the $2.5 million receivable a year earlier, which his argument implicitly suggests was the appropriate analysis.

### b.  The February 26, 2019 Announcement is the Better Basis for the Loss Calculation

DERA did not use an "entirely unrelated" announcement in its event study and Sirotka's argument that DERA should have used an earlier announcement of new revenue on January 3, 2019 is misplaced.  DERA's study was intended to estimate the impact of inflating revenue by $12.5 million.  The February 26, 2019 announcement of new revenue used by DERA is obviously related to revenue and therefore is not "entirely unrelated."  It is also closer in time  to when the fake $12.5 million in revenue would have been announced absent the fraud.  As noted above, that announcement would likely have occurred in the late winter or early spring of 2019, but no later than April 15, 2019, when, under normal circumstances, FTE would have filed its Form 10-K in which it should have disclosed its real revenue figures.  Further, unlike the new revenue announced on February 26, the revenue announced on January 3 was already anticipated by the market.  Palleschi had already announced that FTE would have more than $500 million in new contracts by year end and had already achieved $442.8 million in revenue on an earnings

---

[7]  The receivable could not have been written off against a reserve, if one existed.  There is no such thing as a reserve for fraudulent receivables or non-existent debt.  It also could not have been written off against a bad debt reserve.  Any attempt by the conspirators to do so would not have been credible.  Most of the $2.5 million was supposedly owed by AT&T, a creditworthy international corporation that had a history of paying its bills in a timely way at FTE.

call on November 26, 2018.  There was no corresponding preview of the new revenue FTE disclosed on February 26, 2019.  Thus, the impact on the share price from the January 3 announcement was relatively muted while the reaction to the February 26 announcement was more comparable to what the reaction would have been to the disclosure of a reversal of fake revenue had FTE made such an announcement in April.  Finally, Sirotka's speculation that the market was reacting to other news on February 26 ignores the fact that DERA considered other potential impacts on the share price that day.  Sirotka does not identify any other such news on that day.  Instead, he cites to news about Palleschi that market had absorbed more than a month before February 26.  DERA's use of the February 26 announcement was reasonable and made more sense than using the January 3 announcement.

### c.  FTE Missed its Revenue Guidance

Sirotka's argument that FTE did not miss its $350 million revenue guidance because FTE's May 2020 restated financial statements show revenue of $384.8 million for 2018 is misplaced.  First, Sirotka is responsible for $12.5 million in fake revenue regardless of whether FTE missed its revenue guidance or not.  Second, whether FTE missed its guidance or not  is not that significant.  As noted above, DERA's calculation was focused on the impact of changes in reported revenue to the share price and the relevance of the "miss" is that it set the time for that study.  Third, while FTE did show revenue of $384.8 million in its May 2020 restated financial statements, the restated revenue included unusual, one-time adjustments to revenue due to the accounting for derivatives arising from the convertible notes.  Those adjustments ironically increased revenue in the restated financial statements.  Absent those increases in revenue, FTE would have missed its $350 million revenue guidance figure.  The increases were the result of arcane accounting rules and had nothing to do with revenue recognition issues or Sirotka's fraud.

To consider them would introduce the irrelevant impact of a part of the fraud in which Sirotka did not participate into the calculation of his loss figure.

### d.   There Was No "Annualization" of Fake Revenue

DERA did not "annualize" the false $12.5 million in revenue. As described above, it first subtracted out the fake revenue from reported revenue for the first three quarters of 2018. That is only appropriate because the revenue did not exist. It then annualized the revised revenue figure by dividing it by three (because it represented revenue for three quarters) and multiplying that figure by four (because there are four quarters in a year). It did so to determine the amount of the hypothetically announced "miss" from FTE's 2018 revenue guidance, which was the point in time for its analysis. The $15.1 million "miss" was not otherwise a factor in the calculation of the impact on the fake revenue on FTE's share price, as described above.

### e.   Sirotka Uses the Wrong Number of Outstanding Shares

Finally, Sirotka advocates for the wrong number of outstanding shares. He claims that the Government's calculation improperly includes approximately 3 million shares issued to co-conspirators in its calculation. The records of FTE's transfer agent, which have been provided to Sirotka and are Exhibit A to the restitution orders for codefendants Palleschi and Lethem, show that the number of shares issues to convicted defendants as of November 12, 2018 is 1,333,483.[8] As noted above, those shares were excluded from the calculation. Even including the 467,251 shares held by the uncharged Director-1 as of that date would not raise that figure to 3 million.[9]

---

[8] This figure does not include the 351,558 shares issued to the defendant on October 11, 2018 as part of the ballot box stuffing scheme discussed in the Government's sentencing memos for co-defendants Michael Palleschi and David Lethem. It appears that Sirotka returned those shares to FTE prior to March 8, 2019, which is the date of the transfer agent records that is attached as Exhibit A to the restitution orders.

[9] Sirotka may be referring to the 3.5 million shares issued as part of the ballot box stuffing scheme on October 11, 2018. Of those shares, 1.1 million were issued to charged defendants and have been excluded from the Government's calculation. Another 640,000 shares were issued to consultants pursuant to existing consulting

23

For these reasons, the Government's estimate of the loss is reasonable. It is conservative because it considers only outstanding shares as of November 12, 2018. It is based on the most relevant announcement regarding revenue that was closest in time to when FTE ordinarily would have filed its Form 10-K for 2018, which is when the fraudulent nature of the $12.5 million in revenue would have become apparent. Sirotka's other arguments do not call for a different result.

## III.    Guidelines Calculation

The applicable Guidelines range is 51 to 63 months, based on offense level of 24 and a criminal history category of I. The Government calculates the offense level as follows:

1. The applicable Guideline section is Section 2B1.1.

2. The base offense level is 7 because the statutory maximum for the most serious offense of conviction, securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, is 20 years. U.S.S.G. § 2B1.1(a)(1).

3. The loss was greater than $550,000 million and less than $1.5 million. Accordingly, the offense level is increased by 14 levels. U.S.S.G. § 2B1.1(b)(1)(H).

4. The offense involved 10 or more shareholder victims. Accordingly, the offense level is increased by 2 levels. U.S.S.G. § 2B1.1(b)(2)(A)(i).

5. The offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. Accordingly, the offense level is increased by 2 levels. U.S.S.G. § 2B1.1(b)(10)(C).

6. The offense involved a violation of securities law and at the time of the offense, the defendant was an officer of a publicly traded company. Accordingly, the offense level is increased by 4 levels. U.S.S.G. § 2B1.1(b)(20)(A)(i).

7. The defendant meets the criteria set forth in U.S.S.G. § 4C1.1. Accordingly, the offense level is decreased by 2 levels. U.S.S.G. § 4C1.1(a.)

8. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his conduct prior to the imposition of sentence, a two-

---

agreements, albeit months early in some cases. The remaining 1.8 million were issued to some uncharged members of FTE's Board of Directors.

level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter pleas of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

## IV.    Motion Pursuant to Section 5K1.1

The defendant has provided substantial assistance in the investigation and prosecution of others who have committed offenses. Accordingly, the Government intends to move at sentencing that the Court depart downward to reflect that cooperation, assuming that the defendant continues to comply fully with the terms of his cooperation agreement. The Government also intends to move pursuant to 18 U.S.C. § 3553(e) to permit the Court to impose a sentence below the mandatory minimum two year term that would otherwise apply to Count 5 pursuant to 18 U.S.C. § 1028A.

The defendant began to cooperate in March 2023. He met with the Government twice in March and April 2023. Sirotka was forthcoming in these meetings and readily admitted his guilt. He became the third FTE defendant, after Moser and Lethem, to enter guilty pleas and cooperate.

Sirotka offered testimony that, had he testified, would have been useful in several respects had the Government had to try its case against Palleschi.[10] He corroborated Lethem on several aspects of the revenue recognition scheme, particularly with respect to the 2017 Form 10-K. He described how he became more involved in FTE's financial reporting at Palleschi's request in the spring of 2018 because Marcum had lost faith in Lethem and Palleschi believed that Marcum would find Sirotka more credible. Initially, Palleschi asked Sirotka to discuss FTE's unbilled revenue and pipeline of future work with Marcum. When Sirotka pointed out that

---

[10] Palleschi pleaded guilty in August 2023.

FTE was getting very little work from AT&T as a result of its site surveys, Palleschi became annoyed and said he would handle this issue with Marcum himself.

Sirotka described Jus-Com's agreement with AT&T, which he had negotiated, and confirmed that the agreement required AT&T to pay FTE's bills within 30 or 60 days. He identified Palleschi as the source of the false story that AT&T did not pay for work on a project until all vendors on that project finished their work.

He described how the ten screenshots that he had sent Auditor-1 in April 2018 had been altered to create the appearance that they reflected work FTE had performed rather than work for which FTE had only submitted proposals. He described how the 21 Job Completion Notices were entirely fake and had been created by T.S. at Palleschi's direction. Sirotka also described how Lethem's April 14, 2018 email to Marcum suggesting that FTE did work described in the site surveys was false. He also described his participation the next day with Palleschi and Lethem in the creation of the unbilled memo, in which Palleschi falsely represented to Marcum in writing that FTE did not submits bills to AT&T right away because AT&T did not pay any vendor on a project until all vendors had completed their work.

Sirotka told how he and Lethem helped Palleschi create and send the fake email to create the appearance that AT&T's payment of the $2.5 million miscellaneous receivable was imminent, thus allowing FTE to continue recognizing the receivable. Sirotka corroborated Lethem's statement that Palleschi wrote the email on Sirotka's computer and then provided it to Lethem for him to send it to Marcum.

In addition to corroborating Lethem with respect to the false documents described above, Sirotka would have been able to describe conversations he had with Palleschi that would have proven Palleschi's intent and willfulness. For example, Sirotka would have testified that

26

Palleschi repeatedly minimized the materiality of FTE's fake revenue and, at times, even said that FTE's auditors were aware of the fake revenue but did not care about it because the amounts were relatively small. Most memorably, it was Sirotka who described how Palleschi referred to the fake revenue as a chair off the Titanic. Sirotka would also have testified about Palleschi's repeated attempts to have Director-2, an employee of FTE customer Metro Network Services, to sign an audit confirmation confirming that Metro Network Services owed FTE approximately $600,000. Palleschi and Lethem later forged Director-2's signature on the confirmation after Director-2 refused to sign it. Although Sirotka was not involved in the forgery, his testimony about Palleschi's strong desire to obtain Director-2's signature on the confirmation would have corroborated Lethem's testimony that Palleschi directed the forgery.

After Lethem entered his guilty pleas in May 2023, Sirotka pleaded guilty the next month and Palleschi pleaded guilty in August 2023. The Government believes that Sirotka's earlier plea and cooperation were material factors in Palleschi's decision to plead guilty as well.

Section 5K1.1 sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has provided substantial assistance. U.S.S.G. § 5K1.1(a). The application of each of those factors to the defendant's cooperation is set forth below.

### A.  Significance and Usefulness of the Defendant's Assistance

As noted above, Sirotka's and Lethem's guilty pleas were material factors in Palleschi's subsequent decision to plead guilty himself, thus ensuring the CEO's conviction and saving the Government the considerable resources it would have taken to try this case. Had the case gone to trial, Sirotka's corroboration of much of Lethem's testimony would have been valuable. Moser had relatively limited contact with Palleschi. Had Sirotka not cooperated, the Government would have had to rely heavily on Lethem's testimony, corroborated in part by emails, to convict

Palleschi. As the day-to-day director of the fraud scheme who transmitted most of FTE's false statements to Marcum and who had a prior fraud conviction, Lethem's credibility would have been a material issue at a trial of Palleschi. Sirotka's corroborating testimony would have reduced the significance of this issue, thus significantly increasing the odds of a successful conclusion of a trial against Palleschi.

### B. Truthfulness, Completeness and Reliability of the Defendant's Information

Sirotka was truthful with the Government during his proffers and period of cooperation. The information he provided was, in many instances, corroborated by other witnesses, emails and documents and otherwise simply made sense.

### C. Nature and Extent of the Defendant's Assistance

The defendant was available at all times requested by the Government and answered every question. He was prepared to testify against his co-defendants if called upon to do so.

### D. Risk of Injury to the Defendant or His Family

This was a white collar case. The Government is not aware of any risk incurred by the defendant or his family as a result of his cooperation.

### E. Timeliness of the Defendant's Assistance

The defendant's cooperation was timely. He began to cooperate well in advance of any trial and well in advance of the expiration of the statute of limitations.

## V. Restitution

Sirotka should pay restitution pursuant to 18 U.S.C. §§ 3663 and 3663A in a total amount of $1,448,407 to the shareholders of FTE at the end of the fraud in March 2019 other than Lethem, Palleschi, Moser, himself and an entity controlled by Palleschi. The Court may use the estimated actual loss as a restitution figure. A restitution amount need not be "mathematically precise" and the Court may make a "reasonable estimate . . . based on the evidence before it."

28

*United States v. Fishman*, -- F.4th --*, 2025 WL 2692069 at **14-15 (2d Cir. September 22, 2025). Restitution may be based on a "reasonable approximation of losses," *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013), and may involve factors that are "based on mere probabilities, expectations, guesswork, even a hunch," *United States v. Rainford*, 110 F.4th 455, 490 (2d Cir. 2024).

Payments to the shareholders should be distributed on a pro rata basis based on the number of shares they owned as of March 2019. While the amounts due to some shareholders will be so small as to be impractical to pay, many of the shareholders will recover significant amounts if the amount due is paid in full. Restitution should be joint and several in full with Palleschi, Lethem and Moser.

The Government will submit a proposed restitution order.

## VI.    Conclusion

In light of the above, and assuming that Sirotka continues to comply with the terms of his cooperation agreement, the Government intends to move at sentencing that the Court sentence Lethem under the factors set forth in U.S.S.G. § 5K1.1.  The Government also intends to move pursuant to 18 U.S.C. § 3553(e) to permit the Court to impose a sentence below the mandatory minimum two year term that would otherwise apply to Count 5 pursuant to 18 U.S.C. § 1028A.

Respectfully submitted,

JAY CLAYTON
United States Attorney


                                        /s
By:    _____
       Peter Davis
       James McMahon
       Assistant United States Attorneys

Dated:    November 7, 2025
          New York, New York

cc:  Defense Counsel (by ECF)

30